# IN THE SUPREME COURT OF IOWA

No. 11–0834

Filed July 20, 2012

**UMEKA LEWIS,**

Appellant,

vs.

**JOHN J. JAEGER, ROBERT E. BOGE,**
and **THE CITY OF DUBUQUE,**

Appellees.

Appeal from the Iowa District Court for Dubuque County, Lawrence H. Fautsch, Judge.

Tenant appeals unfavorable district court judgment. **AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED**.

Raymond H. Johnson of Johnson Law Firm, West Des Moines, for appellant.

Leslie V. Reddick of Kane, Norby & Reddick, P.C., Dubuque, for appellees Boge and City of Dubuque.

Cory R. Thein, Dubuque, for appellee Jaeger.

**APPEL, Justice.**

In this case, a tenant brings claims against her landlord, the City of Dubuque, and a city official, asserting that they unlawfully caused her eviction from her apartment. According to the defendants, the eviction occurred because a city housing official, acting pursuant to a city ordinance designed to protect public health and safety in emergency situations, issued a valid oral order directing the landlord to lock out a tenant who, according to the landlord, repeatedly left the water and gas stove running for hours at a time, including periods of time when no one was in the apartment.

The tenant sued the City, the housing official, and her landlord. In her pleading, the tenant alleged that the conduct of the defendants violated a number of her statutory rights under the Iowa Uniform Residential Landlord and Tenant Act (IURLTA), including those related to eviction, entry onto the premises, and return of security deposits. To the extent the Dubuque ordinance authorized the action of the defendants, the ordinance, according to the tenant, was preempted by the IURLTA. The tenant also alleged the city defendants violated her constitutional rights to due process of law by invading her property right in her apartment without notice and an opportunity to be heard. The tenant further claimed the city defendants violated due process by attempting to enforce an unduly vague ordinance. Finally, the tenant brought a common law claim for conversion of her private property, claiming the landlord took some of her possessions during the eviction process.

After a one-day trial, the district court concluded that the tenant was entitled to the return of her security deposit but denied all other relief. The tenant appealed. For the reasons expressed below, we affirm

in part and reverse in part the judgment of the district court and remand for further proceedings.

## I. Factual and Procedural Background.

This case arises out of a landlord–tenant dispute in Dubuque, Iowa, between tenant Umeka Lewis and landlord John Jaeger. Lewis, who was twenty-one years old at the time of trial, receives housing benefits under Section 8, a federal program to assist low-income persons.[1] Jaeger is a landlord who owns and manages twenty-two apartment units in six buildings in Dubuque.

Lewis and Jaeger entered into a one-year rental agreement beginning November 1, 2008, and ending October 31, 2009. The agreement required Lewis to pay a $465 security deposit and $465 each month. Her apartment was part of a four-plex unit. Jaeger was aware that Lewis was a participant in the Section 8 program.

Shortly after moving in, Lewis thought she heard bats in the walls of her apartment. She began to run the water for extended periods of time, including overnight, in an effort to scare the bats away. Also, at about the same time, Lewis found the heat in her apartment inadequate. The thermostat which controlled the heat, however, was located in a different unit and thus beyond Lewis's direct control. In order to increase the heat in her apartment, Lewis turned on her gas stove and opened the oven door. She left the gas stove on with the door open for several hours at a time, including while she slept.

After receiving complaints from other tenants in the apartment building that there was no hot water, Jaeger investigated and determined

---

[1]"Section 8" is a reference to a provision of the United States Housing Act of 1937, as amended in 1974. *See* 42 U.S.C. § 1437(f) (2006). This provision is designed to provide housing assistance to lower income families. *See Horizon Homes of Davenport v. Nunn,* 684 N.W.2d 221, 222 (Iowa 2004).

that Lewis was running the water and heating the apartment with her oven. Jaeger told Lewis to stop, leaving several notes for his tenant. One note stated: "Umeka! Don't pull that shit ever again. [You] can leave whenever you want. Call me. . . . [You are] being charged for the water [and] heat you used!!" A second note declared:

> Umeka,
>
> Here's the deal, if you leave before this lease you can't get housing for [one] year.
>
> If I have to evict you[,] you can't get housing for [three] years.
>
> If you pay for all the charges to the gas [and] water, you can stay!
>
> Otherwise you will be evicted. They will turn the heat up if you are cold. You are running everyone out of hot water.
>
> Your case worker Karen knows about all of this.
>
> Your choice,
>
> John

Lewis ceased running the water and the gas stove.

The winter of 2008–2009 was uneventful. During the spring of 2009, Lewis called the City complaining about bats. Robert Boge, the City's housing inspector supervisor, inspected the premises. He found no evidence of bats and could not find how bats could enter the apartment.

In late September 2009, Lewis told Jaeger that she intended to move to Florida. She asked Jaeger to refund her security deposit so that she could pay an anticipated security deposit for a new apartment. Jaeger declined to make the refund.[2] At about this time, Lewis again

---

[2]A tenant cannot compel premature payment of a security deposit while the tenant's obligation continues, leaving the landlord unsecured for the remainder of the

began to heat her apartment with the oven and to leave the water running for extended periods of time. On several occasions during late September or early October, Jaeger entered Lewis's apartment to turn the gas stove and water off. According to Jaeger, Lewis's response was to simply turn the water and the gas stove back on.

Lewis consulted with an attorney at Dubuque Legal Aid on October 7. Her primary concern was obtaining the security deposit from Jaeger. The fact that Lewis was consulting with a lawyer was a reflection of the deteriorating relationship between Lewis and Jaeger.

Jaeger, too, was looking for outside help with the situation. On October 8, Jaeger telephoned Boge. Jaeger testified that he informed Boge that Lewis would turn on the water and the gas stove and leave them on unattended for extended periods of time. Jaeger further told Boge that he could not turn off the gas and water to Lewis's apartment without also turning off the gas and water to the other apartments in the building. Jaeger claimed that Boge then issued an order to Jaeger to lock the doors to Lewis's apartment. It is undisputed that Boge did not talk with Lewis or attempt to contact her prior to making this oral order.

Jaeger changed the locks on Lewis's apartment. He also gathered her minimal belongings—an air mattress, a fan, and an alarm clock—and placed them outside the apartment. Jaeger then called Lewis on her cell phone and told her he had changed the locks and removed her belongings from the apartment.

---

term of the lease. *See* Iowa Code § 562A.12(3) (2009) (stating a landlord has thirty days from the date of termination of the tenancy and receipt of mailing address or delivery instructions to return the tenant's rental deposit or furnish statement showing the reason for withholding the deposit or any portion thereof); *Seifert v. Dosland*, 328 N.W.2d 531, 532 (Iowa 1983) (holding section 562A.12(3) applies when tenant prematurely terminates lease).

Lewis came to the apartment and gathered her belongings. She called the Dubuque police, asserting that some of her belongings were missing. The Dubuque police arrived and investigated, but the record does not reveal any further action taken at that time by law enforcement authorities.

On October 9, Lewis met with Alex Kornya, a legal aid lawyer, to discuss her plight. Kornya electronically sent a letter to Jaeger claiming that he had evicted Lewis in violation of a provision of the IURLTA, specifically Iowa Code section 562A.26 (2009). In the letter, which was dated October 9, Kornya stated that Lewis was terminating her tenancy as of the date of the letter and demanded the return of her security deposit by Monday, October 12, at 5:00 p.m. Kornya indicated that if the amount was not paid, a small claims action would be filed demanding the security deposit and damages related to her illegal eviction.

On October 12, Boge prepared a handwritten memorandum of the order which was the basis of a more formal typed order. The handwritten order, backdated to October 8, stated: "Landlord is ordered to . . . change the locks on the unit . . . . Tenant is leaving gas stove unattended and letting the hot water run unattended. This is endangering the lives of other occupants of the building."

Based on the handwritten order, city staff prepared a more formal document entitled, "NOTICE TO VACATE." The document consisted of a cover-page letter and an attachment. The cover page, addressed to Jaeger, stated that a "housing inspection" had been performed on the apartment. The second page of the notice, listing "expected repairs," stated that, pursuant to Dubuque City Code section 6-6-4(B)(3):

> LANDLORD IS ORDERED TO CHANGE THE LOCKS ON THE UNIT AT 414 ½ LORAS BOULEVARD. TENANT IS LEAVING GAS STOVE ON UNATTENDED AND LETTING THE HOT

WATER RUN UNATTENDED. THIS IS ENDANGERING THE LIVES OF THE OTHER OCCUPANTS OF THE BUILDING.

**APPEAL RIGHTS, PLEASE NOTE:**

ANY PERSON HAVING ANY RECORDED TITLE OR LEGAL INTEREST OR ANY OCCUPANT HAVING BEEN SERVED A NOTICE AND ORDER, MAY APPEAL FROM THE NOTICE AND ORDER OF ANY ACTION OF THE CITY MANAGER TO THE HOUSING CODE APPEALS BOARD, PROVIDED THE APPEAL IS MADE IN WRITING AS PROVIDED IN THIS CODE, AND FILED WITH THE CITY MANAGER WITHIN FOURTEEN (14) DAYS FROM THE DATE OF SERVICE OF SUCH NOTICE AND ORDER, OR ACTION.

FAILURE TO APPEAL WILL CONSTITUTE A WAIVER OF ALL RIGHTS TO AN ADMINISTRATIVE HEARING AND DETERMINATION OF THE MATTER.

Boge did not leave a copy of the notice on the door of Lewis's apartment, nor did Boge mail or otherwise attempt to provide a copy of the notice to Lewis. In other words, he did not "nail and mail" the notice to achieve service on the tenant.

Lewis subsequently filed an action against Jaeger, Boge, and the City of Dubuque. Counts I through IV of the petition alleged Jaeger illegally retained Lewis's security deposit, unlawfully entered Lewis's apartment, converted Lewis's property, and illegally evicted Lewis.[3] Count VI alleged Jaeger, Boge, and the City of Dubuque acted in concert to deprive Lewis of due process under the Iowa and Federal Constitutions. Specifically, Lewis argued that section 6-6-4(B)(3) of the Dubuque City Code is unconstitutional both on its face and as applied because it is not reasonably calculated to give adequate notice or a hearing. Lewis also asserted the ordinance is vague, overbroad, and preempted by the IURLTA.

---

[3]Count V of the petition alleged the lease contained illegal lease provisions. Lewis filed a motion for partial summary judgment on the issue, which was granted. Although summary judgment was granted, the district court declined to award damages under Iowa Code section 562A.11(2) because it found Jaeger's conduct was not willful. Lewis does not challenge this finding on appeal.

A bench trial was held in March 2011. Lewis gave her side of the story. Among other things, Lewis testified that Jaeger entered her apartment on a number of occasions, including while she was asleep, to turn the water and gas stove off. She admitted that when he left, she would turn the water and gas stove back on. She denied leaving the utilities on when she was not home. Lewis testified that Jaeger called her on the day of the eviction and told her he changed the locks and removed her possessions from the apartment. Lewis stated Jaeger did not mention any involvement by the City during the phone call. When she arrived at the apartment to retrieve her belongings, Lewis claimed a set of earrings given to her by her mother worth about $450, a blanket, and a DVD player were missing. She testified that if an official from the City had requested that she stop running the water or the gas stove, she would have complied. She asserted that as a result of her eviction and the failure of Jaeger to refund her security deposit, she lived in a homeless shelter for a period of time and, when the shelter closed, she lived out of her car. She testified that she often slept in her car at night in a Walmart parking lot or in the parking lot of a local hospital.

Jaeger also testified. He stated Lewis left the water and stove on two or three times during the week of her eviction. He testified that "there was no talking to her," and that once he ensured the water and gas stove were off, Lewis would "turn it right back up." Jaeger further testified that Lewis was not in the apartment when he turned off the utilities. According to Jaeger, at the time he locked her out, "everything was running, which was always the case: The faucet, the kitchen, the bathtub, the vanity in the thing, and the stove on and the door open."

Jaeger testified he told Boge that the gas stove and water were left on unattended in the apartment. Although he spoke with Boge, Jaeger

testified that "[he] was going to lock [Lewis] out pretty much probably anyways because [he] couldn't figure a way to make the people around her safe." After he locked her out, he found no reason to go to court to seek her eviction because, according to his testimony, he "assumed she was gone." He did not give the public housing authority notice regarding the termination of the tenancy because "it seemed like she was going to be gone and out of everyone's lives."

Boge testified about his actions. Boge explained that Jaeger called him and told him that Lewis was upset with him (Jaeger), that she wanted her deposit back, and that she was leaving the apartment with the gas stove turned on and the hot water running to get even with Jaeger. Boge himself had never observed the water running or the gas stove on at the apartment and made no further inquires after his conversation with Jaeger.

Boge stated that he directed the lockout based on the conversation with Jaeger. Boge explained that his order was pursuant to Dubuque City Code section 6-6-4(B)(3), which states:

> Emergencies: Whenever, in the judgment of the city manager, an emergency exists which requires immediate action to protect the public health, safety or welfare, an order may be issued, without a hearing or appeal, directing the owner, occupant, operator or agent to take such action as is appropriate to correct or abate the emergency. If circumstances warrant, the city manager may act to correct or abate the emergency under terms of the Iowa statutes for abatement of public nuisance.

According to Boge, Lewis's conduct created an "emergency" requiring "immediate action to protect the public . . . safety" because "[t]he CO [carbon monoxide] that is emitted from a stove that's running can kill somebody." Boge stated leaving the gas stove unattended creates a fire hazard because the apartment can fill with gas if the pilot light

goes out. Boge also thought leaving the water running unattended posed a risk because, if the sink became plugged, the overflowing water could cause an electrical short resulting in a fire. Boge further testified that he believed that the only way to correct or abate the threat posed by Lewis's behavior was to change the locks on Lewis's apartment.

Boge testified that he did not talk with Lewis about the situation. He indicated that usually the City would post a notice on the door of a residence that was uninhabitable. He testified that he did not know whether Lewis would have listened had he talked to her about the situation.

Two other persons who were tenants in the building at the time of the events, Patricia Stanford and Ellen Johnson, also testified at trial. They recounted problems with hot water at their apartments. Johnson testified that on one occasion, the gas stove was on when Lewis was not at the apartment.

During trial, Jaeger made a confession of judgment in which he admitted that he owed the security deposit and was willing to pay $500. Lewis rejected the offer on the ground that she was entitled to $200 in liquidated damages for bad faith on top of her $465 security deposit.

Following trial, the district court entered its order. The district court made factual findings that the plaintiff "often left her gas stove on and water running for extended periods of time, including while she was asleep and at least several occasions when she was out of the apartment." The district court further determined that Boge ordered Jaeger to change the locks pursuant to the city ordinance after being contacted by Jaeger about the situation in early October. The district court found that "the only feasible way for the City to abate this emergency was to order that the locks be changed because it is clear that

[Lewis] otherwise would have continued to leave the stove on unattended." The district court found that in compliance with the order, Jaeger entered the apartment and changed the locks. Jaeger also placed Lewis's property outside the apartment. In light of its factual findings and its analysis of legal issues, the district court concluded that the city ordinance was not preempted by the IURLTA, that there was no unlawful eviction or unlawful entry, and that no conversion occurred. The district court found that Lewis did not receive any notice of the action by the City, but did not address the due process issues raised by Lewis. Finally, the district court held that Lewis was entitled to her security deposit, but that there was no evidence Jaeger acted in bad faith. Lewis filed a motion to enlarge the findings to include the due process claims, which was overruled.[4] Lewis appealed.

Lewis raises eight issues on appeal. Lewis claims that (1) the ordinance in question is preempted by the IURLTA, codified at Iowa Code chapter 562A; (2) the City violated the due process provisions of the Federal and Iowa Constitutions by ordering the lockout without notice or an opportunity to be heard; (3) the ordinance is void for vagueness under the Federal and Iowa Due Process Clauses; (4) Jaeger unlawfully evicted Lewis under the provisions of the IURLTA; (5) Jaeger acted in bad faith when he failed to return the security deposit; (6) Jaeger converted some of Lewis's belongings; (7) Jaeger illegally entered Lewis's apartment; and

---

[4]The district court did not expressly decide the due process issues in its order overruling the motion to enlarge. We have held that a motion to enlarge findings preserves error on an issue not decided by the district court even if the district court does not address the issue following the motion. *See Madden v. City of Eldridge*, 661 N.W.2d 134, 138 (Iowa 2003); *see also* Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice*, 55 Drake L. Rev. 39, 70 (2006).

(8) Jaeger's confession of judgment at trial was insufficient to preclude Lewis from recovering costs.

## II. Standard of Review.

We review constitutional issues de novo. *Hensler v. City of Davenport*, 790 N.W.2d 569, 578 (Iowa 2010). A wrongful eviction action is at law, and therefore our review is for correction of errors at law. *See Roeder v. Nolan*, 321 N.W.2d 1, 3 (Iowa 1982); *Wernet v. Jurgensen*, 245 Iowa 596, 598, 63 N.W.2d 216, 217 (1954). Issues involving statutory construction, including claims that a local ordinance is preempted by a statute, are reviewable for correction of errors at law. *Hensler*, 790 N.W.2d at 578. The conversion claim is an action at law and reviewable for errors at law. *Murray v. Conrad*, 346 N.W.2d 814, 817 (Iowa 1984); *Larsen v. Housh*, 259 Iowa 911, 913, 146 N.W.2d 314, 315 (1966).

## III. Discussion.

## A. Preemption.

1. *Introduction.* In this case, we consider the interaction of the IURLTA; Iowa Code section 364.17, which requires cities to develop and enforce housing codes; and a Dubuque municipal ordinance related to health and safety in housing. The specific legal question is whether the Dubuque city ordinance is preempted by the IURLTA.

Under legislative home rule, municipalities are permitted to exercise their police power without prior legislative approval or authorization as long as the exercise is not " 'inconsistent with the laws of the general assembly.' " *City of Davenport v. Seymour*, 755 N.W.2d 533, 538 (Iowa 2008) (quoting Iowa Const. art. III, § 38A). The doctrine of preemption has been developed to determine whether municipal action is permitted or prohibited by the legislature. *Id.* We have recognized three types of preemption: express preemption, implied or "conflict"

preemption, and implied field preemption. *Id.* at 538–39. Lewis argues that the IURLTA preempts the Dubuque ordinance under theories of implied conflict and implied field preemption.

Implied conflict preemption occurs "where an ordinance prohibits an act permitted by statute, or permits an act prohibited by statute." *Id.* at 538. The standard for conflict preemption is demanding and requires the local law to be "irreconcilable" with the state law. *Id.* at 539. We presume the ordinance is valid and, if possible, we will interpret the state statute harmoniously with the ordinance. *Id.* Under conflict preemption, "the conflict must be obvious, unavoidable, and not a matter of reasonable debate." *Id.*; *see also Hensler*, 790 N.W.2d at 585; *Goodell v. Humboldt Cnty.*, 575 N.W.2d 486, 493 (Iowa 1998).

Implied field preemption occurs "when the legislature has so covered a subject by statute as to demonstrate a legislative intent that regulation in the field is preempted by state law." *Seymour*, 755 N.W.2d at 539. As with implied conflict preemption, the standard in field preemption is demanding and requires a "clear expression of legislative intent to preempt a field from regulation by local authorities, or a statement of the legislature's desire to have uniform regulations statewide." *Id.*; *see also Hensler*, 790 N.W.2d at 585–86; *Goodell*, 575 N.W.2d at 493.

2. *Position of the parties.* Lewis maintains that the IURLTA preempts any application of Dubuque City Code section 6-6-4(B)(3) to this case. The ordinance provides:

> Emergencies: Whenever, in the judgment of the city manager, an emergency exists which requires immediate action to protect the public health, safety or welfare, an order may be issued, without a hearing or appeal, directing the owner, occupant, operator or agent to take such action as is appropriate to correct or abate the emergency. If

circumstances warrant, the city manager may act to correct or abate the emergency under terms of the Iowa statutes for abatement of public nuisance.

Dubuque, Iowa, Code § 6-6-4(B)(3). Lewis cites Iowa Code section 562A.33, which provides that "[a] landlord may not recover or take possession of [a] dwelling unit by action or otherwise . . . except in case of abandonment, surrender, or as permitted in this chapter." According to Lewis, the only way Jaeger could evict her under the circumstances of this case was to institute an eviction procedure under the IURLTA.

Based on the premise that Jaeger must proceed under the IURLTA in any eviction, Lewis cites Iowa Code section 562A.27A as the procedure that Jaeger was required to follow. Iowa Code section 562A.27A provides that a landlord may bring a proceeding to evict a tenant where the tenant has created "[a] clear and present danger to the health or safety of other tenants." Under Iowa Code section 562A.27A(1), a tenant is entitled to three days' notice and an opportunity to contest the eviction in a court proceeding. According to Lewis, Jaeger and the City circumvented the procedural requirements of the IURLTA by invoking the alleged authority of the City under the ordinance. Lewis sees the conflict between the IURLTA and the ordinance as "obvious, unavoidable, and not a matter of reasonable debate." *See Hensler*, 790 N.W.2d at 585 (citation and internal quotation marks omitted).

Lewis also claims the doctrine of field preemption prevents the application of the city ordinance in this case. According to Lewis, the IURLTA establishes a comprehensive framework for evicting tenants. Because the IURLTA occupies the field, the ordinance can have no application under the facts of this case.

Lewis makes a parallel claim under federal law. As a participant in Section 8 housing, her lease contains an addendum prohibiting eviction

without notice or court proceedings. Under the applicable federal regulations, 24 C.F.R. section 982.310(e)(1)–(2) (2009), a tenant must be given notice of the grounds for termination during the lease term, and the Public Housing Authority must be given a copy of the notice before an action to terminate the lease is commenced. Lewis claims that under the circumstances, federal law prohibits the application of the ordinance against her.

Jaeger counters that this court should seek "to interpret the state law in such a manner as to render it harmonious with the ordinance." *Goodenow v. City Council*, 574 N.W.2d 18, 26 (Iowa 1998). He then cites two provisions of the IURLTA that bolster his position.

The first provision of the IURLTA cited by Jaeger is Iowa Code section 562A.28, which provides:

> If there is noncompliance by the tenant with section 562A.17, materially affecting health and safety, that can be remedied by repair or replacement of a damaged item or cleaning, and the tenant fails to comply as promptly as conditions require in case of emergency . . . the landlord may enter the dwelling unit and cause the work to be done in a competent manner . . . .

Iowa Code § 562A.28. Iowa Code section 562A.17(5) requires a tenant to "[u]se in a reasonable manner all electrical, plumbing, sanitary, heating . . . and other facilities and appliances." These two provisions of the IURLTA, according to Jaeger, allow him to enter the apartment for the purpose of abating the hazard caused by Lewis's conduct.

The second IURLTA provision cited by Jaeger is Iowa Code section 562A.3. The provision states:

> Unless displaced by the provisions of this chapter, the principles of law and equity in this state, including the law relating to capacity to contract, mutuality of obligations, principal and agent, real property, public health, safety and fire prevention, estoppel, fraud, misrepresentation, duress,

coercion, mistake, bankruptcy, or other validating or invalidating cause, shall supplement its provisions.

*Id.* § 562A.3. Jaeger contends that the ordinance is a public health or safety and fire prevention measure that does not conflict with, but supplements, provisions of the IURLTA.[5]

The City repeats much of Jaeger's arguments. The City, however, asserts that Iowa Code section 562A.27A, upon which Lewis relies, does not apply to any emergencies, but only to those relating to clearly illegal activities. According to the City, there is no section of the IURLTA that deals with a situation such as that presented in this case, and therefore, no conflict preemption is present.

3. *Analysis of implied conflict preemption.* Lewis primarily argues the Dubuque ordinance is irreconcilable with Iowa Code section 562A.33. Section 562A.33 states:

> A landlord may not recover or take possession of the dwelling unit by action or otherwise, including willful diminution of services to the tenant by interrupting or causing the interruption of electric, gas, water or other essential service to the tenant, except in the case of abandonment, surrender, or *as permitted by this chapter.*

*Id.* § 562A.33 (emphasis added). Lewis asserts that because chapter 562A does not permit a landlord to take possession of an apartment in order to correct or abate an emergency requiring immediate action, any ordinance permitting a landlord to do so is irreconcilable with section 562A.33.

While Lewis's argument has some appeal, we find it ultimately unpersuasive. The IURLTA generally defines the legal rights and obligations of a landlord and tenant. *See id.* § 562A.2(2)(*a*). Section

---

[5]Jaeger in his brief did not address the question of whether the ordinance was inconsistent with federal law.

562A.33 is a remedial provision confining the methods by which a landlord can take self-help measures.

The ordinance in question, however, does not relate to the legal relationship of landlords and tenants. The ordinance is an enforcement mechanism of the Dubuque housing code which permits *the City*, not the landlord, to take certain actions to cure an emergency requiring immediate action. Section 562A.33 in no way restricts the City's authority to correct or abate emergencies. Instead, the City's authority to adopt and enforce a housing code is controlled by Iowa Code section 364.17.

Iowa Code section 364.17 requires cities with a population of at least fifteen thousand to adopt a housing code. *Id.* § 364.17(1)–(2). The Code further requires cities to "adopt enforcement procedures" which "include but are not limited to" a number of enumerated enforcement mechanisms. *Id.* § 364.17(3)(*a*). The precise ordinance involved in this case, of course, is not specifically mandated, but it is clear that the general assembly expressly granted cities the authority to promulgate enforcement mechanisms of their respective housing codes.[6] The power to enforce housing codes relating to health and safety is traditionally among the core responsibilities of municipal government. We cannot easily conclude that the legislature intended to preempt this traditional local government responsibility through the IURLTA.

Indeed, our caselaw suggests that the relationship between the city's police power over health and safety matters related to housing and landlord/tenant law is symbiotic rather than antagonistic. In the seminal case of *Mease v. Fox*, 200 N.W.2d 791, 796–97 (Iowa 1972), we

---

[6]For a history of Iowa housing code legislation, see Russell E. Lovell II, *The Iowa Uniform Residential Landlord and Tenant Act and the Iowa Mobile Home Parks Residential Landlord and Tenant Act*, 31 Drake L. Rev. 253, 256–61 (1981).

found that a residential lease contained an implied warranty of habitability in part in order to give "overdue recognition . . . for minimum housing standards" established by municipalities and to encourage municipal inspections and enforcement by providing tenants with the right to withhold rent when the implied warranty of habitability was breached. The passage of the IURLTA in 1978 was, in part, a codification of *Mease*. *See* Russell E. Lovell II, *The Iowa Uniform Residential Landlord and Tenant Act and the Iowa Mobile Home Parks Residential Landlord and Tenant Act*, 31 Drake L. Rev. 253, 263 (1981).

Shortly after the passage of the IURLTA, we decided *Wilson v. Nepstad*, 282 N.W.2d 664 (Iowa 1979). In *Nepstad*, we allowed a tenant to sue the city for negligent inspections related to fire safety. *Nepstad*, 282 N.W.2d at 673–74. The new tort liability clearly provided incentive for more effective enforcement of Iowa housing codes. While *Nepstad* did not directly involve the relationship between landlords and tenants, it did emphasize the importance of effective enforcement of local housing codes related to health and safety. *See id.*

Lewis correctly points out that, as construed, the City's action resulted in Lewis being displaced from her apartment. An effect of this was that the landlord came into the possession of the apartment through means other than by abandonment, surrender, or as expressly provided under chapter 562A. Yet chapter 562A is not to be viewed in isolation. Iowa Code section 562A.3 states:

> Unless displaced by the provisions of this chapter, the principles of law and equity in this state, including the law relating to capacity to contract, mutuality of obligations, principal and agent, real property, *public health, safety and fire prevention*, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause, shall supplement its provisions.

Iowa Code § 562A.3 (emphasis added). Housing codes, and their enforcement mechanisms, certainly relate to public health, safety, and fire prevention. Thus, while chapter 562A does not allow a landlord, acting alone, to take possession of an apartment under the circumstances presented here, chapter 562A does allow the city to take appropriate measures to correct or abate an emergency that requires immediate action, even if abatement has the derivative effect of displacing tenants. For example, the IURLTA would not prevent the City of Dubuque from ordering tenants removed from a building with an unsound structure that may crumble at any moment. Thus, the housing code and enforcement provisions found in city ordinances generally supplement the IURLTA.

A narrower issue, however, is whether a city, which generally may exercise police powers without offending the IURLTA, may enforce its order through the owner of the property who also happens to be a landlord. In other words, in order to avoid conflict with the IURLTA, must a city enforce its ordinance directly? We think not. It would elevate form over substance to suggest that a city may have its workers change the locks, but that a city lacks authority to direct the owner of property who happens to be a landlord to do so. There is ample authority for the proposition that when a landlord takes action pursuant to an order of a public official, a breach of the covenant of quiet enjoyment does not occur. *See, e.g.*, *Zwerin v. Geiss*, 237 N.Y.S.2d 280, 284 (Civ. Ct. 1963) (reentry of apartment by landlord required by public authorities does not subject landlord to action for disturbance or interference with leasehold interest); *Dunn v. Mellon*, 23 A. 210, 210 (Pa. 1892) (landlord not liable to tenant for interference of possession of premises where city orders landlord to make building alterations);

*Sunderman v. Warnken*, 29 N.W.2d 496, 499 (Wis. 1947) (landlord entry to make repairs required by public officials not a breach of covenants); 1 Herbert Thorndike Tiffany, *A Treatise on the Law of Landlord and Tenant* § 79(c)(4), at 526 (1912) (disturbance by acts of sovereign do not breach covenant of quiet enjoyment). We think the same reasoning applies when a claim is made that the landlord violates provisions of the IURLTA when acting pursuant to an order by municipal authorities. Because we do not find an obvious or unavoidable conflict between the IURLTA and the ordinance as applied in this case, we reject Lewis's implied conflict preemption claim.[7]

4. *Implied field preemption claim.* Lewis relies on Iowa Code section 562A.27A, which permits a landlord to recover possession of an apartment where the tenant "has created or maintained a threat constituting a clear and present danger to the health or safety of other tenants." Iowa Code § 562A.27A(1). Lewis argues section 562A.27A(1) "exclusively addresses and occupies the field of eviction of tenants where the tenant allegedly has created a 'clear and present danger to the health or safety of other tenants.' "[8] As noted above, however, the ordinance at issue does not involve legal remedies between landlords and tenants, but instead is part of Dubuque's housing code enforcement scheme. The Iowa Code explicitly authorizes cities to breathe life into their housing codes through enforcement measures. The IURLTA simply does not

---

[7]We come to the same conclusion for the same reasons regarding Lewis's claim that Section 8 preempts the Iowa law. *Nunn*, 684 N.W.2d at 228. The applicable regulation cited by Lewis prohibits the "owner" from evicting a Section 8 tenant without notice and a hearing. 24 C.F.R. § 982.310(f). We have concluded, however, that Jaeger's action in response to an order by a city official is not an eviction by him. The same reasoning applies with respect to Lewis's Section 8 claim.

[8]Lewis could also cite section 562A.27(1), which allows a landlord to recover possession of a dwelling for noncompliance with section 562A.17 "materially affecting health and safety."

manifest a clear expression of the legislature's intent to preempt the field of city housing codes and enforcement. Indeed, Iowa Code section 562A.3 suggests the opposite. We therefore reject Lewis's field preemption claim.

**B. Procedural Due Process Claim.** Lewis argues the City violated the due process provisions of the Iowa and Federal Constitutions by issuing the lockout order without notice and an opportunity to be heard.[9]

The City responds by citing a number of cases that stand for the proposition that in emergency situations, property owners are not entitled to prior notice and hearing.[10]

Under procedural due process, notice and an opportunity to be heard are required when a person's property interests are at stake. *War Eagle Vill. Apartments v. Plummer*, 775 N.W.2d 714, 719 (Iowa 2009); *F.K. v. Iowa Dist. Ct.*, 630 N.W.2d 801, 808 (Iowa 2001). We employ a two-step analysis. First, we determine whether a person has been deprived of a protected liberty or property interest. *War Eagle*, 775 N.W.2d at 719; *F.K.*, 630 N.W.2d at 808. If so, we address what process is due for the specific interest. *War Eagle*, 775 N.W.2d at 719; *F.K.*, 630 N.W.2d at 808.

[9]Lewis does not claim that Boge's order to Jaeger was not authorized by the ordinance, nor does Lewis claim that the City's action in this case was inconsistent with state law. *See, e.g.*, Iowa Code § 364.17(3)(*g*) (enforcement procedures shall be designed to improve housing conditions rather than displace persons from their homes).

[10]The parties have not claimed the due process provisions of the Iowa Constitution should be analyzed differently than the Due Process Clause of the Federal Constitution. Under these circumstances, we ordinarily treat the substantive standards under the Iowa Constitution the same as those developed under the Federal Constitution. Even though we ordinarily treat the substantive standards the same when the parties do not suggest a different approach, we reserve the right to apply the standards in a different fashion than the federal caselaw. *See Simmons v. State Pub. Defender*, 791 N.W.2d 69, 76 n.3 (Iowa 2010); *War Eagle Vill. Apartments v. Plummer*, 775 N.W.2d 714, 719 (Iowa 2009); *State v. Bruegger*, 773 N.W.2d 862, 883 (Iowa 2009).

Lewis has been deprived of a property interest. In *War Eagle*, we held a tenant's continued residence in his or her home implicates a significant property interest. *War Eagle*, 775 N.W.2d at 719 (citing *Greene v. Lindsey*, 456 U.S. 444, 450–51, 102 S. Ct. 1874, 1878, 72 L. Ed. 2d 249, 256 (1982)). Although the defendants assert the lockout was not intended to be an eviction, the objective facts suggest otherwise. The City ordered Jaeger to change the locks of the apartment. Further, even if the lockout was intended to be temporary, Lewis was nevertheless deprived of a property interest. *See Fuentes v. Shevin*, 407 U.S. 67, 84–85, 92 S. Ct. 1983, 1996, 32 L. Ed. 2d 556, 572 (1972) ("But it is now well settled that a temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in terms of the Fourteenth Amendment."); *see also Flatford v. City of Monroe*, 17 F.3d 162, 167 (6th Cir. 1994) (stating due process requires notice and hearing prior to eviction). Lewis was therefore entitled to due process protection.

> For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.

*Fuentes*, 407 U.S. at 80, 92 S. Ct. at 1994, 32 L. Ed. 2d at 569 (citation and internal quotation marks omitted); *see War Eagle*, 775 N.W.2d at 719 ("[W]hen an individual's property interests are at stake, that person is entitled to adequate notice and a reasonable opportunity to be heard."); *State v. Seering*, 701 N.W.2d 655, 665–66 (Iowa 2005) ("At the very least, procedural due process requires notice and opportunity to be heard in a proceeding that is adequate to safeguard the right for which the constitutional protection is invoked.") (citation and internal quotation marks omitted). While predeprivation notice and opportunity to be heard is ordinarily required before eviction, *see, e.g., War Eagle*, 775 N.W.2d at

720; *Flatford*, 17 F.3d at 167, postdeprivation notice and opportunity to be heard may be adequate in "extraordinary situations," *see Fuentes*, 407 U.S. at 90, 92 S. Ct. at 1999, 32 L. Ed. 2d at 575. As explained by the United States Supreme Court, postdeprivation notice is adequate when (1) "the seizure has been directly necessary to secure an important governmental or general public interest"; (2) "there has been a special need for very prompt action"; and (3) "the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining . . . that it was necessary and justified in the particular instance." *Id.* at 91, 92 S. Ct. at 2000, 32 L. Ed. 2d at 576; *see also Baker v. City of Iowa City*, 260 N.W.2d 427, 431 (Iowa 1977) (applying *Fuentes*).

Although the City provided notice to Jaeger, it is undisputed that the City failed to even attempt to provide notice to Lewis. Boge did not place a notice on the door of the apartment, did not mail the notice to Lewis, did not inquire of Jaeger how to contact Lewis, and did not instruct Jaeger to take any steps to ensure notice to Lewis. In short, the means employed by Boge—posttermination notice on Jaeger days after the fact—were not such that "one desirous of actually informing the absentee might reasonably adopt to accomplish [notice]." *War Eagle*, 775 N.W.2d at 720 (citation and internal quotation marks omitted).

The City and Jaeger nonetheless argue that "notice was not required in this case because the situation created by . . . Lewis was deemed to be an emergency by the city manager. Under Iowa law, due process requirements do not apply in such emergency circumstances." The City cites *State v. Strayer*, 230 Iowa 1027, 299 N.W. 912 (1941), and *Walker v. Johnson County*, 209 N.W.2d 137 (Iowa 1973), in support of its argument.

Yet here the action of the City did more than abate the emergency situation. Once the lockout was achieved, the nuisance was abated. But the lockout also deprived Lewis of her leasehold interest in her apartment on an ongoing basis. In the event of emergencies, we regard the law as well established that summary administrative action is appropriate. *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 299–301, 101 S. Ct. 2352, 2372–73, 69 L. Ed. 2d 1, 30–31 (1981); *Gorra Realty, Inc. v. Jetmore*, 510 A.2d 440, 446 (Conn. 1986). But this justifies only the imposition of the lockout and not the maintenance of the lockout on an ongoing basis. Because of the ongoing effects of the lockout on her property right, we believe Lewis is entitled to a postdeprivation notice and an opportunity to be heard.

Before we find a due process violation based on lack of notice and hearing, however, we must consider the fact that Lewis elected to terminate her lease on October 9. While there was certainly a right to a prompt postdeprivation hearing, Lewis makes no claim that she was entitled to a postdeprivation hearing the day after her eviction as a matter of law. Thus, even if she were entitled to a postdeprivation hearing, she abandoned that claim by terminating her property interest in the lease. Under these circumstances, we find the due process claim is moot. *See Smith v. Bd. of Cnty. Comm'rs*, 891 P.2d 88, 92 (Wyo. 1995) (holding due process claim of terminated employee was moot where plaintiff voluntarily resigned position).

**C. Void for Vagueness.**

1. *Introduction.* Lewis also argues the ordinance violates due process because the term "emergency" is too vague.[11] Citing *Grayned v.*

---

[11]As with procedural due process, this challenge is brought under both the Iowa and Federal Constitutions. Because Lewis does not suggest that the Iowa Constitution

*City of Rockford*, 408 U.S. 104, 92 S. Ct. 2294, 33 L. Ed. 2d 222 (1972), Lewis asserts that no person of ordinary intelligence would be able to determine what conduct is lawful. Further, according to Lewis, the ordinance, which states that whether an emergency is present rests in "the judgment of the city manager [or his delegate]," fails to provide sufficient guidelines to limit the discretion of the City in enforcing the ordinance.

The City responds by asserting that a person challenging a statute as void for vagueness carries a heavy burden to overcome a presumption of constitutionality. *See State v. Bauer*, 337 N.W.2d 209, 210 (Iowa 1983). The City further asserts that vagueness of the ordinance can be avoided by reasonable construction. *See State v. Duncan*, 414 N.W.2d 91, 95 (Iowa 1987).

In considering vagueness challenges, we have emphasized three theoretical underpinnings to the doctrine. *State v. Nail*, 743 N.W.2d 535, 539 (Iowa 2007). First, a statute cannot be so vague that a person of ordinary understanding would not know that their conduct is prohibited. *Id.* Second, the statute must not be so vague as to encourage arbitrary or discriminatory enforcement. *Id.* Finally, a statute cannot sweep so broadly as to prohibit substantial amounts of constitutionally protected speech. *Id.*; *see also Formaro v. Polk Cnty.*, 773 N.W.2d 834, 840 (Iowa 2009). Because free speech is not an issue in this case, we address the notice and arbitrary enforcement components of vagueness analysis.

2. *Vagueness based on lack of notice.* We have had several occasions to address as-applied vagueness challenges to city ordinances

---

should be interpreted differently, we assume the state and federal standards are similar. *See Bruegger*, 773 N.W.2d at 883. Even so, we reserve the right to apply the standard under the Iowa Constitution in a more rigorous fashion than federal precedents. *Id.*; *State v. Feregrino*, 756 N.W.2d 700, 704 n.1 (Iowa 2008).

on grounds of lack of notice. A city ordinance is unconstitutionally vague under the due process clause "when its language does not convey a sufficiently definite warning of the proscribed conduct." *Devault v. City of Council Bluffs*, 671 N.W.2d 448, 451 (Iowa 2003). We articulated the legal test for notice required to overcome a vagueness challenge in *Knight v. Iowa District Court*, 269 N.W.2d 430, 432 (Iowa 1978), in which we stated: "If the statute's meaning is fairly ascertainable by reliance on generally accepted and common meaning of words used, or by reference to the dictionary, related or similar statutes, the common law or previous judicial constructions, due process is satisfied." An ordinance is not unconstitutionally vague for lack of notice merely because a key word is undefined. *Blinder, Robinson & Co. v. Goettsch*, 403 N.W.2d 772, 773 (Iowa 1987).

Given the factual findings of the district court, which are generally not challenged in this appeal,[12] we reject Lewis's vagueness claim on notice grounds. An "emergency" is defined as "an unforeseen combination of circumstances or the resulting state that calls for immediate action," and "an urgent need for assistance or relief." *Merriam Webster's Collegiate Dictionary* 377 (10th ed. 2002). The emergency under the ordinance must relate to public safety in the context of housing. A person of ordinary understanding would know that repeatedly leaving an ignited gas stove unattended for seven or eight hours at a time poses an imminent threat to the safety of the tenants in an apartment building. The danger is exacerbated when a tenant demonstrates repeated unwillingness to abate the threat at the request of the landlord. Further, the uncontroverted testimony of the housing

---

[12]Lewis does challenge the factual finding that the withholding of the security deposit by Jaeger was not in bad faith.

inspector supports the proposition that leaving running water and a gas stove on unattended for several hours creates a fire hazard and a risk of carbon monoxide that endangers the lives of all those in the building. *See People v. Plane*, 78 Cal. Rptr. 528, 530 (Ct. App. 1969) (declaring it beyond argument that landlord, concerned and responsible for the safety of tenants, knowing that renter left apartment unexpectedly with reasonable possibility of an unattended lighted stove, may enter apartment to ensure safety). Under these circumstances, we cannot conclude that a person of ordinary understanding would not know that Lewis's conduct, as determined by the factual findings of the district court, created an emergency that required immediate action to protect public safety. *See State v. Doe*, 231 P.3d 1016, 1030 (Idaho 2010) ("emergency errand or other legitimate business" not unconstitutionally vague).

3. *Vagueness based upon potential for arbitrary or discriminatory conduct.* There is, however, a second important prong of void for vagueness doctrine, namely, to prevent the vesting of virtually unlimited discretion in governmental officials. *Grayned*, 408 U.S. at 108–09, 92 S. Ct. at 2298–99, 33 L. Ed. 2d at 227–28. This second prong is more problematic in this case.

The term "emergency" is potentially very broad. On top of the elastic term "emergency," the ordinance provides that an emergency exists according to "the judgment" of city officials. There are no criteria in the ordinance for the determination of emergency. The ordinance explicitly states that there is no right of appeal. Further, the ordinance does not detail the enforcement remedies that might be available. Read literally, you could not fight city hall under the ordinance.

The fundamental question before us is whether we can, as the City suggests, save this ordinance through reasonable construction or whether the elastic terms render it fatally flawed. There are, of course, competing principles at stake here. On the one hand, as the City rightly observes, broadly framed statutes may be saved from constitutional defect through judicial construction. On the other hand, courts are not legislatures. We are not in the business of rewriting statutes or ordinances.

There are a few cases standing for the proposition that when a legislative enactment fails to establish any meaningful standards, courts should not blue pencil them into the law. For example, in *United Nuclear Corp. v. Cannon*, 553 F. Supp. 1220, 1233, 1235 (D.R.I. 1982), the court held that a state statute requiring the posting of a "Ten Million Dollar ($10 million) bond" to cover the cost of "decontamination" was hopelessly vague and could not be rescued by judicial construction. *See also S. of Second Assocs. v. Georgetown*, 580 P.2d 807, 811 (Colo. 1978) (historic preservation ordinance fails to provide sufficient standards to determine if location is within historic preservation area); *Chronis v. State ex rel. Rodriguez*, 670 P.2d 953, 957–58 (N.M. 1983) (clause which states that action may be taken when "public health, safety, and welfare requires emergency action" held vague under New Mexico Constitution). As a general matter, however, we have embraced the notion that judicial construction may save an otherwise vague statute from constitutional infirmity. *Nail*, 743 N.W.2d at 540.

In looking at the ordinance in question, there is good reason to use an elastic term such as "emergency." In order to protect public safety, the ordinance must necessarily use language that is sufficiently flexible to cover a wide variety of factual situations that may arise. We do not

require a legislative body to define every term. The ordinary definition of a broad term like "emergency" is available to limit the reach of the ordinance. *See People v. McKnight*, 617 P.2d 1178, 1187–88 n.9 (Colo. 1980) (citing *Webster's Seventh New Collegiate Dictionary* definition of "emergency" in rejecting due process attack on sentencing provision related to automobile statute); *Doe*, 231 P.3d at 1030 (using the definition of "emergency" in *Webster's Third New International Dictionary* as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" to limit the scope of a statute). Further, the context of the ordinance demonstrates that the emergencies referenced are limited to those involving health and safety issues in housing.

In addition, although a statute employing broad terms is obviously more susceptible to being applied in an arbitrary or discriminatory fashion than one containing detailed language, an ordinance may be narrowed through an implied term of objective reasonableness. For example, in *Commission for Lawyer Discipline v. Benton*, 980 S.W.2d 425, 438–39 (Tex. 1998), the court implied an objective reasonableness standard to narrow the scope of a disciplinary rule that prohibited an attorney from making comments "calculated . . . to harass or embarrass the juror or to influence his actions." The court explained that the objective reasonableness standard assuaged vagueness concerns and reduced the danger of arbitrary enforcement. *Benton*, 980 S.W.2d at 439.

In the end, we believe that in light of the application of the commonly understood definition of emergency, the implied requirement that the judgment of the city manager or his delegate be exercised in an objectively reasonable fashion, and with the due process guarantee of

notice and an opportunity to be heard, the ordinance survives a void-for-vagueness due process challenge.

**D. Unlawful Eviction by Jaeger.** Lewis next argues she was unlawfully evicted by Jaeger. Lewis argues Jaeger unlawfully evicted her because he failed to comply with Iowa Code section 562A.27A(1), which she says provides the exclusive means to evict a tenant posing a clear and present danger to other tenants. Lewis also asserts there was no emergency situation that would justify eviction under section 562A.27A(1).

As discussed above, however, the ordinance permits the city manager, or his designee, to order an owner to correct or abate an emergency that requires immediate action. Depending on the circumstances, the ordinance may require residents to be displaced from their homes while the emergency is resolved. In this case, the City ordered Jaeger to change the locks on Lewis's apartment. Jaeger, whether he agreed or disagreed with the City's decision, had no choice in the matter.[13] Jaeger therefore did not unlawfully evict Lewis by carrying out the City's order.[14] *See Zwerin*, 237 N.Y.S.2d at 284; *Dunn*, 23 A. at 210–11; *Sunderman*, 29 N.W.2d at 498.

**E. Unlawful Entry by Jaeger and Other Tenants.** Lewis claims Jaeger and other tenants unlawfully entered the apartment on three

---

[13]Jaeger testified that he would have locked Lewis out in any event, but the record shows that Jaeger first called the City, was orally ordered by Boge to lock Lewis out, and then proceeded to do so. Although he might well have locked her out in any event, he was acting pursuant to an order by Boge to do so.

[14]Lewis makes no allegation that the City erroneously concluded an emergency existed or otherwise exceeded its authority under the ordinance. Whether the City complied with the requirements of the ordinance, therefore, is not at issue. *See Sell v. City of Columbus*, 47 F. App'x 685, 697–98 (6th Cir. 2002) (holding city official exceeded scope of similar ordinance by ordering emergency eviction, in absence of hearing, without first determining whether postponing the eviction would jeopardize health and safety).

occasions. She cites the entry by Jaeger when he entered the apartment pursuant to the order of the City but also removed her belongings from the apartment and placed them outside the apartment building. She also claims that on two occasions Jaeger allowed another renter, Ellen Johnson, to enter the apartment without her permission. The district court concluded that there were no unlawful entries.

Ordinarily, a lease vests in a tenant the right of exclusive possession, which precludes entry by the landlord except for limited purposes. Milton R. Friedman, *Friedman on Leases* § 4:3.1, at 4–21 (Patrick A. Randolph, Jr. ed., 5th ed. 2012). Under the IURLTA, a "landlord may enter the dwelling unit without [the] consent of the tenant in case of emergency." Iowa Code § 562A.19(2). The landlord, however, "shall not abuse the right of access or use it to harass the tenant." *Id.* § 562A.19(3). Except in cases of emergency or when it is impractical, the landlord is directed to give the tenant twenty-four hour notice before entering. *Id.* Aside from the Code section, the landlord does not have another right of access "except by court order, and as permitted by sections 562A.28 and 562A.29, or if the tenant has abandoned or surrendered the premises." *Id.* § 562A.19(4).

The order from the City authorized Jaeger to lock Lewis out of her apartment. But there is nothing in the order that authorized Jaeger to enter the apartment for the purpose of seizing her belongings and removing them from the premises. We have upheld landlord entry under Iowa Code section 562A.29 for a limited purpose of assisting police in investigating a potential burglary. *State v. Koop*, 314 N.W.2d 384, 387 (Iowa 1982). Even assuming that Jaeger's actions in changing the lock on the apartment pursuant to an order by the City may not have given rise to a violation of the IURLTA, his entry into the apartment to gather

Lewis's belongings and remove them from the premises amounts to action well beyond the scope of entries permitted by Iowa Code section 562A.19 and the order of the City and constitutes an abuse of the right of entry. *See Reichhold v. Sommarstrom Inv. Co.*, 256 P. 592, 593 (Cal. Ct. App. 1927) (landlord's authority to enter premises and put it in safe condition did not authorize actions exceeding the scope of those ordered by city inspector); *Kalmas v. Wagner*, 943 P.2d 1369, 1373 (Wash. 1997) (stating a cause of action arises when property manager exceeds the scope of entrance permitted by statute); *see also Stankiewicz v. Hawkes*, 369 A.2d 253, 253–54 (Conn. Super. Ct. 1976) (where tenant absent from apartment to allow landlord to abate health hazard, landlord could not take tenant's possessions and pile them in backyard, even though landlord considered the property rags and junk).[15] For this abusive entry, we conclude that based upon the undisputed facts, Lewis has established a violation of the IURLTA. *See* Iowa Code § 562A.19(3). Under Iowa Code section 562A.35(2), Lewis is entitled to recovery of actual damages not less than an amount equal to one month's rent and reasonable attorney fees.

Next, Lewis claims that by allowing other tenants into her apartment, Jaeger violated section 562A.19. The record established that the only tenant other than Lewis to enter Lewis's apartment was Johnson. Johnson testified she was in Lewis's apartment twice without permission from Lewis.

The defining characteristic of a leasehold interest is the tenant's right to possession of the premises. *Nathan Lane Assocs., L.L.P. v.*

---

[15]We do not address the issue of a landlord's duty with respect to tenant property after a lawful eviction. *Khan v. Heritage Prop. Mgmt.*, 584 N.W.2d 725, 729 (Iowa Ct. App. 1998) (finding that a landlord generally has no duty to store or maintain a tenant's personal property after a tenant has been lawfully evicted).

*Merchants Wholesale of Iowa, Inc.*, 698 N.W.2d 136, 139 (Iowa 2005). A tenant's right to possession is generally exclusive, and the tenant, not the landlord, has legal control of the leased premises. *Bernet v. Rogers*, 519 N.W.2d 808, 811 (Iowa 1994).

Yet, Lewis has not brought a trespass case against Johnson. Instead, Lewis claims that by authorizing Johnson to enter Lewis's apartment, an unlawful entry occurred under Iowa Code sections 562A.19 and 562A.35. While Johnson testified that on one occasion she went with Jaeger to Lewis's apartment after Jaeger had knocked on the door of Johnson's apartment, Johnson later on cross-examination testified that she entered the apartment on her own without obtaining Jaeger's permission. Although there is evidence in the record to support Lewis's theory of unlawful entry with respect to one of the entries, we cannot say the district court erred as a matter of law in concluding that the plaintiff failed to prove Jaeger authorized the entry of Johnson. Therefore, Jaeger is not liable for any claimed unlawful entry arising from Johnson's intrusion into Lewis's apartment.[16]

**F. Bad Faith Retention of Security Deposit.** It is undisputed that Jaeger failed to return Lewis's rental deposit in the amount of $465. Iowa Code section 562A.12(3) requires a landlord to return a tenant's rental deposit or provide a written statement showing the specific reason for withholding the deposit within thirty days of the receipt of the tenant's mailing address or delivery instructions. Iowa Code section 562A.12(7) states:

> 7. The bad faith retention of a deposit by a landlord, or any portion of the rental deposit, in violation of this

---

[16]Nothing in this opinion should be construed as preventing a landlord from reasonably permitting workers access to an apartment for the purpose of abating a potential hazard or for any other lawful purpose.

section shall subject the landlord to punitive damages not to exceed two hundred dollars in addition to actual damages.

The burden is on the tenant to show the landlord held the security deposit in bad faith before punitive damages will be awarded. *Roeder v. Nolan*, 321 N.W.2d 1, 4 (Iowa 1982). Bad faith can be established by circumstantial or direct evidence. *Id.* at 5.

The district court found that Jaeger owed the security deposit to Lewis, but did not act in bad faith in failing to pay it. The only basis Jaeger offered for failing to pay the security deposit at trial was lack of knowledge regarding where Lewis resided.

We recognize that there is authority for the proposition that when a tenant does not leave a forwarding address and the landlord cannot find the tenant, there is no basis for an award of a penalty. *Smith v. Callico*, 562 So. 2d 1102, 1105 (La. Ct. App. 1990) (failure of landlord to send accounting for repairs of premises justifying retention of security deposit was not willful violation of statute where lessee did not provide forwarding address); *Alston v. Thomas*, 391 A.2d 978, 980 (N.J. Essex County Ct. 1978) (where landlord does not know forwarding address and cannot find tenant in the exercise of reasonable diligence, statutory requirements to give notice to tenant related to security deposit are excused), *overruled on other grounds by Reilly v. Weiss*, 966 A.2d 500, 506 n.4 (N.J. Sup. Ct. App. Div. 2009).

On the other hand, the court in *Prescott v. Makowski*, 458 N.E.2d 1281, 1283 (Ohio Ct. App. 1983), held that, under a statute similar to Iowa Code section 562A.12, when a tenant does not provide a forwarding address, but the landlord has actual knowledge of the tenant's subsequent residence, the landlord is required to refund the security deposit. According to the *Prescott* court, the state statutory requirement

that the tenant provide a forwarding address was solely designed to ensure that the landlord knew where to send the deposit. *Prescott*, 458 N.E.2d at 1283. Further, in an unreported case, an Ohio appellate court has held that a current business address, known to the landlord, has been sufficient to require payment of the security deposit to the tenant at that address. *Smitson v. Zeches*, No. 92AP-1773, 1993 WL 317243, at **2–3 (Ohio Ct. App. Aug. 17, 1993).

In this case, Jaeger claimed he did not know where to send the security deposit as no address was given to him during the litigation. We accept that Jaeger did not know where Lewis was currently residing. It is undisputed, however, that Jaeger received a demand letter by Lewis's legal counsel shortly after the eviction, on letterhead, setting a deadline for him to pay the security deposit to Lewis. The letter plainly amounts to "delivery instructions" with respect to the security deposit under Iowa Code section 562A.12(3). Further, during the entire time when this matter was pending in Dubuque County, Jaeger was aware that Lewis was represented by counsel.

Yet, Jaeger made no effort to pay the security deposit by providing it to Lewis's attorney. He knew from events leading up to October 8 that Lewis needed the funds for a security deposit on a new apartment. He knew that, as a person receiving Section 8 assistance, Lewis was a person of limited means. He nevertheless withheld the security deposit. Instead of paying it, his lawyer tried to offer to confess what was plainly owed as a strategy to shift the costs of the litigation.

Under these undisputed facts, we conclude that Jaeger knew he owed Lewis the money, knew that Lewis had a pressing need for the money, had no plausible reason for not paying it, and simply ignored the demand by Lewis's counsel. While we recognize that the district court's

factual finding on bad faith must be affirmed if supported by substantial evidence, we conclude that the undisputed facts require us to reverse the district court and find that the refusal to pay the security deposit was done in bad faith. *See Tammen v. Page*, 584 S.W.2d 914, 917 (Tex. Civ. App. 1979) (bad faith retention of security deposit under landlord and tenant statute found where attorney for tenant wrote demand letter that provided attorney's address). As a result, Lewis, in addition to the return of the $465 security deposit ordered by the district court, is entitled to punitive damages not to exceed $200, any actual damages shown on the present record, and may be entitled to an award of reasonable attorney fees. Iowa Code § 562A.12(7)–(8).

**G. Conversion.** Conversion is "the wrongful control or dominion over another's property contrary to that person's possessory right to the property. The wrongful control must amount to a serious interference with the other person's right to control the property." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 593 (Iowa 1999) (citations omitted). At trial, Lewis alleged Jaeger did not return some of her belongings after her eviction, including $450 earrings, a blanket, and a DVD player. Jaeger testified, however, that he returned all Lewis's possessions when he changed the locks to the apartment. Stating that Jaeger was more credible on the issue, the district court found that he did not convert any of Lewis's possessions. After reviewing the record at trial, we find no reason to disturb the district court's findings on the conversion issue.

**H. Confession of Judgment.** During opening statements, Jaeger's attorney made an oral offer to confess judgment in the amount of $500 for the rental deposit. Lewis's attorney rejected the offer on the grounds that Jaeger owed an additional $200 for bad faith retention of

the security deposit. In its decision, the district court awarded Lewis $465 for the rental deposit, but ordered Lewis to pay the court costs in light of Jaeger's offer to confess judgment for $500. On appeal, Lewis asserts Jaeger's offer to confess judgment was insufficient because section 677.7 of the Iowa Code requires the offer to be made in writing. *See* Iowa Code § 677.7.

Iowa Code section 677.4, however, states, "After an action for the recovery of money is brought, the defendant may offer in court to confess judgment for part of the amount claimed, or part of the causes involved in the action." A confession under section 677.4 must be made when the plaintiff is present. *Lingo v. Belt*, 198 Iowa 1276, 1278, 201 N.W. 5, 5 (1924). Before opening statements, the court observed that Lewis was present with her attorney. In any event, no issue has been made of Lewis's presence during the offer. *See Sheer Constr., Inc. v. W. Hodgman & Sons, Inc.*, 326 N.W.2d 328, 333 (Iowa 1982); *see also Manning v. Irish*, 47 Iowa 650, 652 (1878) (courts may, in absence of evidence to the contrary, presume plaintiff's presence). While Jaeger may not have complied with section 677.7, Jaeger did make a sufficient offer to confess judgment under section 677.4.

However, based on the conclusions in this opinion, it is clear that the offer to confess judgment in the amount of $500 was below the amount to which Lewis is entitled. Therefore, the offer to confess has no effect, and Lewis cannot be ordered to pay court costs as a result of the offer.

**IV. Conclusion.**

As indicated above, we affirm the district court's ruling that the city ordinance is not preempted by the IURLTA and that there has been no violation of federal law in connection with the action of Jaeger or the

City. We further find that the ordinance is not unconstitutionally vague and that any procedural due process claim is moot. We conclude, however, that Jaeger violated the IURLTA when he removed the belongings of Lewis from the apartment. We also conclude that Jaeger's withholding of Lewis's security deposit was a bad faith violation of the IURLTA. As a result, the judgment of the district court is affirmed in part and reversed in part. The case is remanded for further proceedings in order to determine actual damages not less than an amount equal to one month's rent for the unlawful entry violation, to award bad faith damages on the withholding of the security deposit, and to address the question of an award of attorney fees and costs for the violations of the IURLTA.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED.**