# IN THE SUPREME COURT OF IOWA

No. 18–1037

Filed June 28, 2019

**CHERYL ALBAUGH,**

Appellant,

vs.

**THE RESERVE,**

Appellee.

_____

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

The appellant appeals the district court's grant of summary judgment concluding the Iowa Uniform Residential Landlord and Tenant Act does not apply to retirement facilities and appellant had no other claims against the retirement facility as a matter of law. **AFFIRMED.**

Jason M. Craig and Emily A. Kolbe of Ahlers & Cooney, P.C., Des Moines, for appellant.

William J. Miller of Dorsey & Whitney, LLP, Des Moines, for appellee.

**CHRISTENSEN, Justice.**

On behalf of her mother, Cheryl Albaugh challenges the district court's grant of summary judgment in favor of a "senior adult congregate living facility" as defined in Iowa Code chapter 523D. Iowa Code § 523D.1(11) (2016). She sued the facility after it would not return her mother's entrance fee or supplemental amount when her mother had to vacate the facility for health reasons. Albaugh argued the agreement between her mother and the facility violated Iowa Code chapter 562A, the Iowa Uniform Residential Landlord and Tenant Act (IURLTA). She also presented several other claims, including consumer fraud, breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, and unconscionability. The district court granted the facility's motion for summary judgment, concluding the IURLTA did not apply to the facility and the facility was entitled to judgment as a matter of law on all other claims. We affirm the district court judgment on appeal for the reasons discussed below.

## I. Background Facts and Proceedings.

Cheryl Albaugh holds power of attorney for her mother, Shirley Voumard, a former resident of The Reserve on Walnut Creek (Reserve) from October 2007 to September 2014. The Reserve is a member-owned, nonprofit senior adult congregate living facility in Urbandale, Iowa, that is governed by a board of directors and "offers residents the opportunity to enjoy retirement without the hassle of home ownership." It provides housing and supportive services to its residents with periodic charges in consideration of an entrance fee. These supportive services include various home healthcare services, maintenance, communal activities, security, transportation, and dining options.

To become a member of the Reserve, "an individual or couple must be 60+ years old, of sufficiently good health to live an independent life, and must be able to meet certain minimum financial requirements." Voumard entered into a contract with the Reserve called an "application agreement" (agreement) on September 27, 2007, to obtain a membership interest in the Reserve and the right to occupy a two-bedroom apartment there. Voumard agreed to pay certain fees to cover the Reserve's operation expenses. She agreed to pay a $64,975 entrance fee and a $63,557 supplemental amount upon signing the agreement.[1] She also agreed to pay a varying monthly fee that was originally set at $1078 "in advance of the first day of each succeeding month until such Resident's Residential Membership is transferred as detailed in these Covenants of Occupancy." In doing so, Voumard agreed to pay the monthly charges "until the earlier of (i) the date [her] Residential Membership is transferred as provided in Article 7, or (ii) the date [her] Residential Membership is terminated as provided in Article 12."

This agreement contained the following bold-faced language:

> **i. Upon disbursement of such Entrance Fee and such Supplemental Amount to the uses and purposes of the Corporation the Corporation will have no further obligation to refund or return such Entrance Fee or such Supplemental Amount to Applicant.**

> **ii. Applicant's ability to recover such Entrance Fee and such Supplemental Amount will depend entirely on the**

---

[1]The supplemental amount was paid to lower Voumard's monthly fee. The supplemental amount and the monthly fee, in combination, are intended to cover Voumard's proportional share of the costs incurred by the Reserve. The monthly fee is set by the Reserve's board of directors, a majority of whom are elected by the members. Where a resident has paid a supplemental amount, the board must "fairly and equitably account for" the supplemental amount in establishing that resident's monthly fee. The agreement also states that "[n]o resident shall be charged with more than his/her proportionate share thereof as determined by the Board of Directors."

Applicant's ability to assign or transfer his Membership in the Corporation to another person or persons.

iii. The Monthly Charge is subject to fluctuation.

iv. Upon the transfer of Applicant's Membership in the Corporation to another person or persons there is no guarantee the Applicant will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy.

v. Should Applicant default under the terms of the Covenants of Occupancy, which default is not cured in a manner deemed satisfactory by the Corporation, Applicant's Residential Membership shall be terminated and all of Applicant's right, title and interest in and to such Entrance Fee, such Supplemental Amount, and such other funds as may have accrued during Applicant's residency within the Development pursuant to Article 7 of the Covenants of Occupancy shall be forfeited by Applicant and become the sole and separate property of the Corporation, and the Corporation shall have the right and authority to transfer Applicant's Apartment to an assignee or transferee. Upon such transfer, the Corporation, in its sole discretion, shall have the right to deduct all Monthly Charges by Applicant and other expenses due and payable upon transfer.

(Emphasis omitted.)

Just above the signature line, the agreement stated, "This Agreement will supersede any prior understandings and agreements and constitutes the entire agreement between us, and no oral representations or statements shall be considered a part hereof." Voumard elected Albaugh as her personal representative on the agreement. Thus, pursuant to the agreement, Albaugh was appointed to receive copies of the agreement, "the [Reserve's] Articles of Incorporation, Bylaws, Covenants of Occupancy and all other notices, disclosures, or forms required to be delivered to [Voumard] under Chapter 523D of the Iowa Code."

In August 2014, the Reserve began contacting Albaugh about Voumard's inability to care for herself. The Reserve contacted Albaugh

multiple times, and Voumard was subsequently diagnosed with dementia. After Voumard's doctor determined she could no longer live independently, Albaugh notified the Reserve that Voumard would be vacating her unit as of September 13, in order to move into an assisted living facility.

Albaugh has not sold or transferred Voumard's unit either to a third party or to the Reserve. In accordance with the agreement, the Reserve has continued to bill Voumard pursuant to the agreement after she moved out of the Reserve. Albaugh has requested the Reserve refund Voumard's entrance fee and supplemental amount. The Reserve continues to deny this request. On February 5, 2015, the Reserve sent Albaugh a notice of default informing her that Voumard's rights under the agreement would be terminated and her entrance fee and supplemental amount would be deemed forfeited if Voumard's unpaid charges were not paid within thirty days. Voumard's unpaid charges totaled $5132 at the time the Reserve sent the notice. Albaugh disputed these charges and requested a refund of Voumard's entrance fee and supplemental amount as a rental deposit pursuant to the IURLTA.

In March, the Reserve's elected board of directors announced a change to the Reserve's financial structure due to the increase in "Type A" units the Reserve owned through default or donation. Type A units came with a higher monthly fee than Voumard's "Type B" unit. Due to the Reserve's increase in Type A units, the Reserve allowed these units to be transferred for an entrance fee of $5000. The Reserve did not change the monthly charges for these units, and the board of directors declared, "Please be assured that there will be no 'steering' of prospects away from member-owned units up for transfer, and we'll continue working hard on moving all available units."

The Reserve subsequently implemented a leasing program in July to allow members to lease their units to qualified individuals and to allow the Reserve to lease Reserve-owned units "at market-competitive lease rates." According to the Reserve's marketing director, this program has increased demand and led to a waiting list for units at the Reserve. Though Albaugh communicated with the Reserve's marketing director about marketing and transferring Voumard's membership interest, the record is unclear concerning the extent of these marketing efforts. Since Voumard vacated her unit at the Reserve, Albaugh has repeatedly requested a full refund of Voumard's entrance fee and supplemental amount. The Reserve continues to deny these requests, and it declared Voumard in default on March 8, 2016.

On August 24, Albaugh filed a lawsuit in district court against the Reserve in which she presented seven claims. First, she argued the agreement between Voumard and the Reserve violated the IURLTA. Second, Albaugh claimed the Reserve violated Iowa Code chapter 523D, governing retirement facilities. Third, she alleged the Reserve engaged in consumer fraud in violation of Iowa Code chapter 714H. Fourth, Albaugh maintained the Reserve breached its fiduciary duties to Voumard. Fifth, Albaugh maintained the Reserve breached the implied covenant of good faith and fair dealing. Sixth, she argued Voumard should no longer be held to the terms of her agreement with the Reserve due to impossibility of performance or frustration of purpose. Finally, Albaugh challenged the enforceability of the agreement, claiming it was unconscionable. The Reserve brought in the Essex Corporation as a third-party defendant in its capacity as the former manager of the Reserve to seek indemnity and contribution.

Albaugh filed a motion for partial summary judgment on December 11, 2017, requesting the district court enter judgment that the agreement between Voumard and the Reserve is subject to the IURLTA and relief consistent with that judgment. The Reserve filed a motion for summary judgment on December 20, arguing the agreement is not subject to the IURLTA and challenging Albaugh's other claims as a matter of law. The Essex Corporation filed a motion for summary judgment in which it argued it had no liability to the Reserve to the extent the Reserve had no liability to Albaugh and, alternatively, the undisputed facts fail to establish a basis for a claim of contribution or indemnity as a matter of law.

On May 26, 2018, the district court denied Albaugh's motion for partial summary judgment and granted the Reserve's motion for summary judgment. In doing so, the district court concluded that "the legislature did not otherwise intend for [the IURLTA] to be applicable to an arrangement governed by chapter 523D" and Albaugh's other claims failed to generate any genuine issue of material fact. The district court granted Essex Corporation's motion for summary judgment, noting there was no "need to consider the claims against the [Essex Corporation] . . . in the absence of a direct claim by [Albaugh] against the [Reserve]." Albaugh filed a timely notice of appeal on June 14, and we retained the appeal.

## II. Standard of Review.

Our review of a district court ruling on a motion for summary judgment is for correction of errors at law. *Jahnke v. Deere & Co.*, 912 N.W.2d 136, 141 (Iowa 2018). "Summary judgment is proper when the moving party has shown 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.' " *Id.* (quoting *Homan v. Branstad*, 887 N.W.2d 153, 163 (Iowa 2016)). We review

the district court ruling on any statutory interpretation issues presented in a motion for summary judgment for correction of errors at law. *Id.*

### III. Analysis.

Albaugh presents several claims on appeal. First, she argues the IURLTA applies to the Reserve and requests relief based on the Reserve's alleged violations of the IURLTA. Second, Albaugh claims the Reserve committed consumer fraud. Third, she maintains the Reserve breached its fiduciary duty to Voumard. Fourth, Albaugh proclaims the Reserve also breached the implied covenant of good faith and fair dealing. Finally, she asserts the Reserve's agreement with Voumard was unconscionable.

**A. The Applicability of the IURLTA to Retirement Facilities.** Albaugh contends the district court erred in granting the Reserve's motion for summary judgment based on its conclusion that the IURLTA is inapplicable to the Reserve and other retirement facilities governed by Iowa Code chapter 523D.

Iowa Code chapter 523D is entitled "Retirement Facilities" and is applicable to a provider who executes a contract for housing and one or more "supportive services" in a facility that "is or will be located in this state" and where the contract "requires or permits the payment of an entrance fee." Iowa Code §§ 523D.1, .2. Some examples of supportive services include activity services, housekeeping, dining options, emergency nursing care, and transportation. *Id.* § 523D.1(12). As a provider that contracts with residents to supply this sort of housing and living services in an Iowa facility, the Reserve is considered a retirement facility and thus governed by chapter 523D.

On the other hand, "[t]he IURLTA generally defines the legal rights and obligations of a landlord and tenant" in a rental agreement. *Lewis v. Jaeger,* 818 N.W.2d 165, 178 (Iowa 2012). A " 'rental agreement' means

an agreement . . . embodying the terms and conditions concerning the use and occupancy of a dwelling unit and premises." Iowa Code § 562A.6(11).

The crux of Albaugh's claim against the Reserve concerning the IURLTA is that Voumard's $64,975 entrance fee and $63,557 supplemental amount should be refunded to Voumard because they are improper rental deposits under the IURLTA. This brings us to the fundamental issue: whether the fees permitted by chapter 523D are rental deposits subject to the IURLTA.

We reconcile Chapter 523D and the IURLTA by considering the rules of statutory construction.[2] *See Citizens' Aide/Ombudsman v. Miller*, 543 N.W.2d 899, 902 (Iowa 1996) ("The controversy arises only when [the statutes] are jointly brought to bear on the facts. . . . We therefore proceed to a consideration of the rules of statutory construction."). Under these rules, " '[t]he primary purpose of statutory construction is to determine legislative intent,' gleaned from the words used by the legislature." *Simon Seeding & Sod., Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 461 (Iowa 2017) (quoting *State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000) (en banc)). To ascertain legislative intent, we examine "the language used, the purpose of the statute, the policies and remedies implicated, and the consequences resulting from different interpretations." *Des Moines Flying Serv., Inc. v. Aerial Servs., Inc.*, 880 N.W.2d 212, 220 (Iowa 2016) (" '[A] statute should not be interpreted to read out what is in a statute as a matter of clear English' and should not render terms superfluous or

---

[2]Considered separately, chapter 523D and the IURLTA are not ambiguous. When the meaning of a statute contains no ambiguity, "the statute will be applied in accordance with its plain meaning." *Citizens' Aide/Ombudsman v. Miller*, 543 N.W.2d 899, 902 (Iowa 1996). However, because Iowa Code § 523D.7(5) states, "[t]his chapter does not limit a liability which may exist by virtue of any other statute or under common law if this chapter were not in effect," it does not preempt the application of other statutes. As a result, any latent conflict must be resolved through the rules of statutory construction. *Miller*, 543 N.W.2d at 902.

meaningless." (quoting 1A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 21:1, at 163 (7th ed. 2009))). Further, legislative intent is also derived from the statute's subject matter and object to be accomplished. *See Homan*, 887 N.W.2d at 166. In doing so, "[w]e assess the entire statute and its enactment to 'give the statute its proper meaning in context.'" *Aerial Servs. Inc.*, 880 N.W.2d at 220 (quoting *Sanon v. City of Pella*, 865 N.W.2d 506, 511 (Iowa 2015)). "We will not consider what the legislature 'should or might have said' when it construed a statute." *Homan*, 887 N.W.2d at 153 (quoting Iowa R. App. P. 6.904(3)(*m*) ("In construing statutes, the court searches for the legislative intent as shown by what the legislature said, rather than what it should or might have said.")).

We now turn to the relevant statutory provisions to determine whether the fees regulated under chapter 523D are subject to the IURLTA. Iowa Code section 523D.1 provides, in relevant part,

> 4. "*Entrance Fee*" means an initial or deferred transfer to a provider of a sum of money or other property made or promised to be made as full or partial consideration for acceptance of a specified individual in a facility if the amount exceeds either of the following:
>
> *a.* Five thousand dollars.
>
> *b.* The sum of the regular periodic charges for six months of residency.

Iowa Code § 523D.1(4)(*a*)–(*b*). The provision of the IURLTA on which Albaugh relies provides,

> 12. "*Rental Deposit*" means a deposit of money to secure performance of a residential rental agreement, other than a deposit which is exclusively in advance payment of rent.

Iowa Code § 562A.6(12). Chapter 562A further defines a rental deposit and states,

1.  A landlord shall not demand or receive as a security deposit an amount or value in excess of two months' rent.

. . . .

3.  *a.*  A landlord shall, within thirty days from the date of termination of the tenancy . . . return the rental deposit to the tenant or furnish to the tenant a written statement showing the specific reason for withholding of the rental deposit or any portion thereof. . . . The landlord may withhold from the rental deposit only such amounts as are reasonably necessary for the following reasons:

(1)  To remedy a tenant's default in the payment of rent or of other funds due to the landlord pursuant to the rental agreement.

(2)  To restore the dwelling unit to its condition at the commencement of the tenancy, ordinary wear and tear excepted.

(3) To recover expenses incurred in acquiring possession of the premises from a tenant who does not act in good faith in failing to surrender and vacate the premises . . . .

*Id.* § 562A.12(1), (3)(*a*).

Affording each statute its proper context, the words used by the legislature reflect the intent to regulate two entirely distinct living arrangements.  Chapter 523D regulates facilities that provide housing together with supportive services.  In contrast, Chapter 562A pertains to the rights and obligations of a landlord and tenant.  This distinction is made plain by what the legislature said in each definition.  An entrance fee only qualifies as an entrance fee if the amount *exceeds* "five thousand dollars" or "[t]he sum of the regular periodic charges for six months of residency" and is used as consideration for acceptance in a facility.  *Id.* § 523D.1(4)(*a*)–(*b*).  A rental deposit, however, is limited to "two months' rent" and may only be used to remedy the tenant's default, to restore the dwelling unit to its prior condition, and to recover expenses associated with the recovery of the premises.  *Id.* § 562A.12(1), (3)(*a*).  This reasonably demonstrates the legislature did not contemplate the use of an entrance

fee as a rental deposit because the statutory definition of entrance fee is neither constrained to two months' rent nor restricted as a landlord's remedial function.

We conclude the plain statutory language makes clear the legislature did not intend the fees permitted by chapter 523D be subject to the rental deposit provision of the IURLTA. *See Ryan v. Maryann Morse Healthcare Corp.*, No. 1681CV02433A, 2018 WL 6424841, at *5 (Mass. Super. Ct. Jan. 9, 2018) (concluding the legislature did not intend assisted living facilities be subject to the security deposit statute governing aspects of the landlord–tenant relationship). *But see Hennessy v. Brookdale Senior Living Cmtys. Inc.*, No. 1784CV04215BLS2, 2018 WL 4427020, at *2 (Mass. Super. Ct. Aug. 1, 2018) (determining the assisted living resident agreement "is in part a residential lease and is therefore, to that extent, subject to" the rights and duties of a residential landlord and tenant pertaining to security deposits). Accordingly, the district court did not err in granting the Reserve's motion for summary judgment based on the inapplicability of the IURLTA.

**B. Consumer Fraud.** Albaugh maintains the district court erred in granting the Reserve's motion for summary judgment on her consumer fraud claim under Iowa Code chapter 714H. Iowa Code section 714H.3(1) provides,

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise . . . .

An "unfair practice" is "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." *Id.* § 714H.2(9). The statute broadly defines "merchandise" to include "objects, wares, goods, commodities, intangibles, securities, bonds, debentures, stocks, real estate or services." *Id.* § 714H.2(6).

Albaugh claims the Reserve committed consumer fraud in 2015 by prioritizing the sale of the units it held for a low entrance fee and later leasing units to residents without an entrance fee or supplemental amount. According to Albaugh, these practices were unfair because Voumard entered into the agreement with the understanding that the Reserve would refund her entrance fee and supplemental amount and no one informed Voumard that the Reserve would begin leasing or selling units in this manner. Nevertheless, the agreement between Voumard and the Reserve clearly states otherwise. The agreement stated,

> Upon the transfer of Applicant's Membership in the Corporation to another person or persons there is no guarantee the Applicant will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during Applicant's residency within the Development . . . .

Further, Albaugh does not point to, nor does the record contain, evidence that the Reserve engaged in a practice that it knew or should have known was unfair under section 714H. Notably, Albaugh omits the knowledge element from her brief entirely in explaining the statute. In any event, Albaugh's argument that a reasonable jury could find the Reserve's actions unfair and "rely on its own common sense" to support this conclusion does not demonstrate that the Reserve knew or should have known it was engaging in an unfair practice. There is no evidence that the Reserve knew in 2007—when Voumard entered her agreement with the

Reserve—that it would have to lower the price on entrance fees in 2015. Thus, the district court correctly granted the Reserve's motion for summary judgment on this claim.

**C. Breach of Fiduciary Duty.** Albaugh challenges the district court's decision to grant the Reserve's motion for summary judgment on her breach of fiduciary duty claim based on its conclusion that Albaugh "failed to identify a factual basis upon which a fiduciary relation could exist." Albaugh argues the Reserve owed a fiduciary duty to Voumard because Voumard relied on the Reserve to protect the value of her membership. The existence of a fiduciary relationship "turns on the facts of the case," and "may, in some cases, be decided by the court in a summary-judgment proceeding." *Cemen Tech, Inc. v. Three D Indus., L.L.C.*, 753 N.W.2d 1, 13 (Iowa 2008). The term "fiduciary duty" is "very broad," as it "embrac[es] both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another." *Id.* (quoting *Kurth v. Van Horn*, 380 N.W.2d 693, 695 (Iowa 1986)).

A fiduciary relationship "exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other." *Id.* (quoting *Kurth*, 380 N.W.2d at 695–96). Indicative factors of a fiduciary relationship

> include the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another.

*Weltzin v. Cobank, ACB*, 633 N.W.2d 290, 294 (Iowa 2001) (quoting *Kurth*, 380 N.W.2d at 696). In contrast, a fiduciary relationship does not exist when the relationship exists through an "arms-length transaction," which

is "[a] transaction between two unrelated and unaffiliated parties" or "[a] transaction between two parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises." *Arms-length Transaction, Black's Law Dictionary* (10th ed. 2014); *see also Pirkl v. Nw. Mut. Ins.*, 348 N.W.2d 633, 635 (Iowa 1984) (holding there was no clearly defined fiduciary duty in an arms-length relationship).

The district court correctly granted the Reserve's motion for summary judgment on this issue because Voumard and the Reserve engaged in an arms-length transaction that did not establish a fiduciary relationship. The record demonstrates that Voumard and the Reserve entered into the agreement as unrelated and unaffiliated parties. The indicative factors of a fiduciary relationship are not present here, as Voumard and the Reserve negotiated and entered the agreement on equal footing without the Reserve having any form of influence over Voumard. *See Weltzin*, 633 N.W.2d at 294. Moreover, despite Albaugh's claim that Voumard put her confidence in the Reserve to protect her entrance fee and supplemental amount, we have already noted the application agreement between Voumard and the Reserve stated there was "no guarantee [Voumard] will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during [her] residency within the Development." Overall, nothing in the record supports Albaugh's claim that a fiduciary relationship existed between the parties.[3] The district court correctly granted the Reserve's motion for summary judgment on this issue.

---

[3]The Reserve was managed by a board of directors, a majority of whom were elected by all members, including Voumard. The directors owed a fiduciary duty to act for the benefit of the Reserve, not an individual member.

**D. Breach of Implied Covenant of Good Faith and Fair Dealing.**

Albaugh contends the district court erred in granting the Reserve's motion for summary judgment on her breach-of-implied-covenant-of-good-faith claim. Albaugh claims Voumard had a justified expectation that future residents would have to pay entrance fees like she did to become a resident, and the Reserve breached this expectation when it reduced the prices of the Reserve-owned units and later offered lease options to prospective residents without an entrance fee. An implied covenant of good faith and fair dealing is inherent in all contracts. *Alta Vista Properties, LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Id.* (quoting *Am. Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011)). This implied covenant "does not give rise to new substantive terms that do not otherwise exist in the contract." *Id.* at 731 (quoting *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012)).

Here, no terms exist in the agreement to support Albaugh's argument that the Reserve breached an implied covenant of good faith and fair dealing. Nothing in the agreement suggested the Reserve would enable Voumard to recover her entrance fee or supplemental amount. Rather, the agreement explicitly stated that Voumard's ability to recover these fees "will depend entirely on [Voumard]'s ability to assign or transfer [her] Membership in the Corporation to another person or persons." Consequently, "any allegation of bad faith here lacks a contract term to which it can be attached." *Bagelmann*, 823 N.W.2d at 34 (declining to find a breach of the implied covenant of good faith and fair dealing when a mortgagee did not promptly provide mortgagors with updated and more

accurate flood zone information determinations because nothing in the mortgage contained a promise to provide this information).  We affirm the grant of summary judgment to the Reserve on this issue.

**E.  Unconscionability.**  Albaugh proclaims the district court erred in granting the Reserve's motion for summary judgment on her unconscionability claim.  She points to a number of provisions in the agreement that she believes are unconscionable.  Some of these claims rely on the application of the IURLTA, and we need not examine them further given our holding that the IURLTA does not apply to the Reserve.

"A contract is unconscionable where no person in his or her right senses would make it on the one hand, and no honest and fair person would accept it on the other hand."  *C & J Vantage Leasing Co. v. Wolfe*, 795 N.W.2d 65, 80 (Iowa 2011).  "Whether an agreement is unconscionable must be determined at the time it was made."  *Bartlett Grain Co., LP v. Sheeder*, 829 N.W.2d 18, 27 (Iowa 2013).  "[W]e examine factors of 'assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness'" to determine whether a contract is unconscionable.  *Id.* (quoting *C & J Vantage*, 795 N.W.2d at 80).  Nevertheless, "the doctrine of unconscionability does not exist to rescue parties from bad bargains."  *Id.* (quoting *C & J Vantage*, 795 N.W.2d at 80).

We generally recognize procedural and substantive unconscionability.  *Id.*  Procedural unconscionability "includes the existence of factors such as 'sharp practices[,] the use of fine print and convoluted language, as well as a lack of understanding and an inequality of bargaining power.'"  *Id.* (alteration in original) (quoting *In re Marriage of Shanks*, 758 N.W.2d 506, 515 (Iowa 2008)).  Substantive unconscionability "includes 'harsh, oppressive, and one-sided terms.'"  *Id.* (quoting *In re Marriage of Shanks*, 758 N.W.2d at 515).

Albaugh maintains the agreement between Voumard and the Reserve was substantively unconscionable, yet she presents no evidence to demonstrate the agreement was unconscionable at the time Voumard and the Reserve entered into it. The agreement did not contain any elements of unfair surprise, as it clearly informed Voumard of her payment obligations regardless of whether she was still occupying her unit. *See id.* It provided her with explicit notice that her ability to recover the entrance fee and supplemental amount depended entirely on her ability to assign or transfer her membership interest to someone else, and Voumard assented to the terms of the agreement. *See id.* Nothing in the record suggests Voumard was unable to understand what she was assenting to.

Further, as we have already noted, Voumard and the Reserve entered into the agreement on equal footing, so there was not a disparity of bargaining power. *See id.* Despite Albaugh's claim that the agreement is so "harsh, oppressive, and one-sided" that "no man in his senses and not under delusion would make" it, there was a waiting list for certain types of units at the Reserve when Voumard joined. *In re Marriage of Shanks*, 758 N.W.2d at 514–15 (first quoting *Rite Color Chem. Co. v. Velvet Textile Co.*, 411 S.E.2d 645, 648 (N.C. Ct. App. 1992); and then quoting *Casey v. Lupkes*, 286 N.W.2d 204, 207 (Iowa 1979)). In fact, a motivating factor in Voumard's decision to enter her agreement with the Reserve was that Albaugh's mother-in-law was already a member there. Finally, we note Iowa Code chapter 523D expressly allows the entrance fee and supplemental amount outlined in the Reserve's agreement. *See* Iowa Code §§ 523D.2, .3, .6. Considering these factors, we affirm the district court's decision to grant summary judgment in favor of the Reserve.

**IV. Conclusion.**

For these reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Appel and Wiggins, JJ., who dissent, and Cady, C.J., who takes no part.

**APPEL, Justice (dissenting).**

### I. Introduction.

I respectfully dissent. In my view, the majority errs in its resolution of Cheryl Albaugh's claim under the Iowa Uniform Residential Landlord and Tenant Act, Iowa Code chapter 562A (IURLTA).

Iowa Code chapter 523D (retirement facilities statute) and the IURLTA address, at least in part, the same subject matter. This is a common occurrence in Iowa law. The legislature, as well as our own caselaw, direct that when statutes govern the same subject matter, we should strive to reconcile potential conflicts through harmonizing the statutes. Iowa Code § 4.7 (2016); *In re Estate of Kirk*, 591 N.W.2d 630, 633 (Iowa 1999).

The harmonizing of statutes "constrain[s] judicial discretion in the interpretation of laws." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109, 111 S. Ct. 2166, 2170 (1991). We do not interpret statutes to generate conflict. With a firm hand and a determined eye, we deliberately and conscientiously seek to avoid conflict in such situations.

Further, aside from our efforts to avoid the shoals of conflict, we do not find that statutes conflict unless they meet the extraordinary standard of "positive repugnancy." *State v. Perry*, 440 N.W.2d 389, 391 (Iowa 1989) (quoting *United States v. Batchelder*, 442 U.S. 114, 122, 99 S. Ct. 2198, 2203 (1979)). Not simply overlapping, or related, or dealing with the same subject matter. They must be positively (not by implication or construction) repugnant (completely conflicting).

But the statutes here are easily harmonized through a modest effort at reconciliation. Simply put, a facility can impose an entrance fee under Iowa Code section 523D.1(4) as long as that entrance fee is not used as an

illegal rental deposit under Iowa Code section 562A.6(12) and .12(1). The majority through an expansive interpretation concludes that the retirement facilities statute allows an entrance fee in an amount and with a purpose that would be prohibited by the IURLTA. This approach is hardly avoiding the shoals of conflict. Are the statutes positively repugnant after our best efforts to reconcile them through statutory interpretation designed to further the ends of both statutes? No. Under the statutes, a retirement facility can charge an entrance of any amount over $5000 so long as the purpose is not to secure performance of the rental agreement.

The legislature is presumed to know the contents of prior law. *Mulhern v. Catholic Health Initiatives,* 799 N.W.2d 104, 118–19 (Iowa 2011). Thus, the legislature was presumably aware of the provisions of the IURLTA. Yet it chose not to expressly override the IURLTA. There is no positive repugnancy.

But there is more. Even if the statutes were irreconcilable and positively repugnant notwithstanding a conscientious effort to interpret them in harmony, the broadly worded savings clause in Iowa Code section 523D.7(5) provides a legislative directive that liabilities under "any other statute" remain in effect as if the retirement facilities statute "were not in effect." The legislature has thus expressly stated what happens if the provisions of the retirement facilities statute are found, after determined harmonization efforts, to be irreconcilable with another statute. In cases of irreconcilable conflict, the legislature has declared that liabilities in other sections of the Code survive, period.

Rather than apply the savings clause in a straightforward manner, the majority twists the statute by *inferring* exclusivity in the definition of an entrance fee. On what basis? There is no provision of exclusivity in

the statute, and as recognized by the majority, the retirement facilities statute does not preempt the IURLTA. Well, the majority points out, the IURLTA would otherwise limit the scope of allowable entrance fees. But that does not imply exclusivity. Does the retirement facilities statute also trump the statutory prohibitions on discrimination in rental agreements, since antidiscrimination provisions would otherwise limit the scope of allowable entrance fees? Of course not. Taken to its logical conclusion, the majority's rationale suggests that any statutory prohibition potentially conflicting with the retirement facilities statute must be obliterated. Of course, that comes at the expense of the legislative directions to harmonize statutes and to choose statutory liability under other statutes where harmonization is not possible.

We have repeatedly declared, with blaring legal bugles, that it is not our province to rewrite statutes. *See State v. Doe*, 927 N.W.2d 656, 665 (Iowa 2019) ("We cannot rewrite the statute . . . ."); *State v. Walden*, 870 N.W.2d 842, 843 (Iowa 2015) ("We decline the State's invitation to apply the absurd-results doctrine to effectively rewrite the statute."); *In re A.M.*, 856 N.W.2d 365, 378 (Iowa 2014) ("We are not free to rewrite a statute in the guise of interpretation."). If the principle so proudly proclaimed in these cases has any real meaning, it must be applied consistently to the unambiguous savings clause in Iowa Code section 523D.7(5). Likewise, we are not at liberty to choose which statutory provisions apply absent irreconcilability. We must honor legislative choices, not rewrite them.

In the end, the majority inexorably bulldozes to its result by declining to interpret the statutes to avoid conflict and by remodeling the statutory savings clause. What gives? The result today chooses a disclosure approach over the substantive regulation of security deposits in the IURLTA. But in doing so, the majority avoids our caselaw and the

choices actually made by the legislature through a novel mechanism of judicial override that departs from our traditional approach.

**II. Discussion.**

**A. The Statutes Are Easily Harmonized.**

1. *Potentially conflicting statutes are harmonized unless irreconcilable.* The legislature has instructed us to harmonize potentially conflicting statutes. "If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both." *Id.* § 4.7; *accord In re Estate of Kirk*, 591 N.W.2d at 633. We have said, "If a court can reasonably harmonize two statutes dealing with the same subject, it must give concurrent effect to both, even though one is specific, or special, and the other general." *State v. Lutgen*, 606 N.W.2d 312, 314 (Iowa 2000) (quoting 82 C.J.S. *Statutes* § 355, at 474–75 (1999)). "[R]elated statutes . . . should be construed together as though they constituted one law, that is, they must be construed as one system." *State v. Peters*, 525 N.W.2d 854, 857 (Iowa 1994) (quoting 82 C.J.S. *Statutes* § 366, at 801–08 (1953)). If two statutory provisions can be harmonized, it is unnecessary to consider which provision is more specific. *Citizens' Aide/Ombudsman v. Miller*, 543 N.W.2d 899, 903–04 (Iowa 1996).

The demanding standards are a result of the presumption that the legislature is aware of existing law when it enacts new statutes. *See Mulhern*, 799 N.W.2d at 118–19; *Slager v. HWA Corp.*, 435 N.W.2d 349, 353–54 (Iowa 1989) (en banc). The lack of positive repugnancy thus indicates a legislative intent to harmonize the statutes.

Harmonizing two apparently conflicting statutes "constrain[s] judicial discretion in the interpretation of the laws." *Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 109, 111 S. Ct. at 2170; *see Good v. Crouch*, 397 N.W.2d 757, 760 (Iowa 1986) ("A finding of implied repeal in the absence

of such a clear showing of legislative intent 'would constitute a usurpation of legislative authority.' " (quoting *State v. Rauhauser*, 272 N.W.2d 432, 435 (Iowa 1978)). We do not interpret statutes to generate conflicts; we assiduously interpret statutes to avoid conflict.

It is only when the very high bar of irreconcilability is met that a specific statutory provision will prevail over a general provision. To demonstrate irreconcilability, "[i]t is not enough to show that the two statutes produce differing results when applied to the same factual situation. The legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions.' " *Perry*, 440 N.W.2d at 391 (quoting *Batchelder*, 442 U.S. at 122, 99 S. Ct. at 2203); *see Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 88 (Iowa 2014) (explaining that an implied repeal occurs "only where the statutes 'cover the same subject matter,' are 'irreconcilably repugnant,' and implied repeal is 'absolutely necessary' " (quoting *Rauhauser*, 272 N.W.2d at 434)).

This "demanding" standard exists because "[t]he legislature is presumed to know the existing state of the law when the new statute is enacted," and "[i]n the absence of any express repeal, the new provision is presumed to accord with the legislative policy embodied in prior statutes." *Freeman*, 848 N.W.2d at 88. We have found that statutory provisions may be reconciled when they require different statutory elements to show a violation or when one provision supplements another. *Peters*, 525 N.W.2d at 858. We have also found that statutory provisions may be reconciled where "the wording of the statutes does not suggest they may not coexist" and "the provisions of the more specific one are not included in the general one." *Lutgen*, 606 N.W.2d at 314.

2. *The retirement facilities statute and the IURLTA can be easily harmonized.* The retirement facilities statute "applies to a provider who

executes a contract to provide continuing care or senior adult congregate living services in a facility . . . if the contract requires or permits the payment of an entrance fee to a person." Iowa Code § 523D.2. " 'Continuing care' means housing together with supportive services, nursing services, medical services, or other health related services, furnished to a resident . . . in consideration of an entrance fee." *Id.* § 523D.1(2). Similarly, " '[s]enior adult congregate living services' means housing and one or more supportive services furnished to a resident . . . in consideration of an entrance fee." *Id.* § 523D.1(11). An entrance fee is a transfer of money or property "made as full or partial consideration for acceptance of a specified individual in a facility if the amount exceeds either . . . [f]ive thousand dollars [or] [t]he sum of the regular periodic charges for six months of residency." *Id.* § 523D.1(4).

The IURLTA allows certain rental deposits and prohibits others. A rental deposit is "a deposit of money to secure performance of a residential rental agreement, other than a deposit which is exclusively in advance payment of rent." *Id.* § 562A.6(12). But a rental deposit cannot be "an amount or value in excess of two months' rent." *Id.* § 562A.12(1).

Is there an irreconcilable conflict here? No. The fact that the retirement facilities statute allows entrance fees for housing and acceptance into the facility does not create "positive repugnancy between the provisions" in the retirement facilities statute and the IURLTA. *Perry*, 440 N.W.2d at 391 (quoting *Batchelder*, 442 U.S. at 122, 99 S. Ct. at 2203). We are not at liberty to *infer* from the ambiguous terms "housing" and "acceptance . . . in a facility" that the retirement facilities statute permits entrance fees to secure performance of a residential rental agreement, manufacture a conflict with the IURLTA, and unleash "judicial discretion in the interpretation of the laws." *Astoria Fed. Sav. & Loan Ass'n,* 501 U.S.

at 109, 111 S. Ct. at 2170. As the United States Supreme Court recently explained,

> When confronted with two Acts of Congress allegedly touching on the same topic, this Court is not at "liberty to pick and choose among congressional enactments" and must instead strive "to give effect to both." A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing "a clearly expressed congressional intention" that such a result should follow. The intention must be "clear and manifest." And in approaching a claimed conflict, we come armed with the "stron[g] presum[ption]" that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute.
>
> These rules exist for good reasons. Respect for Congress as drafter counsels against too easily finding irreconcilable conflicts in its work. More than that, respect for the separation of powers counsels restraint. Allowing judges to pick and choose between statutes risks transforming them from expounders of what the law *is* into policymakers choosing what the law *should be.* Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them.

*Epic Sys. Corp. v. Lewis,* 584 U.S. ___, ___, 138 S. Ct. 1612, 1624 (2018) (alterations in original) (first quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S. Ct. 2474, 2483 (1974); then quoting *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533, 115 S. Ct. 2322, 2326 (1995); then quoting *Morton,* 417 U.S. at 551, 94 S. Ct. at 2483; and then quoting *United States v. Fausto,* 484 U.S. 439, 452–53, 108 S. Ct. 668, 676 (1988)). We might show the same respect to the Iowa legislature.

At most, the ambiguous nature of "housing" and "acceptance . . . in a facility" requires us to harmonize those provisions with the limitations on rental deposits in the IURLTA. *See* Iowa Code § 4.7. An entrance fee is permitted if it is consideration for acceptance into the facility or for

continuing care services, but it is not permitted to secure performance of a residential rental agreement in an amount greater than two months' rent.

Another approach is to carefully observe the limitations of the retirement facilities statute. An entrance fee is defined as a payment for "*acceptance* of a specified individual in a facility" that exceeds certain amounts. *Id.* § 523D.1(4) (emphasis added). The words are clear: It is a fee for acceptance into a facility. It gets you in the door. It is a ticket of admission for entrance on day one. But the authorizing of an entrance fee for purposes of "acceptance of a specified individual in a facility" is not contrary to the security deposit provisions of the IURLTA. The authorization of an entry fee "for acceptance" is neither positively repugnant with the IURLTA nor an implied permit to evade the provisions of the IURLTA. If the provisions of the retirement facilities statute preempted other statutes and regulations, entrance fees could be used in discriminatory fashion without violating civil rights law, transportation services could be provided by unlicensed chauffeurs who violate rules of the road, and nursing services could be provided in a fashion contrary to medical practices.

Some concrete examples illustrate the ease with which the provisions are harmonized. An entrance fee can be charged for certain "housing together with supportive services, nursing services, medical services, or other health related services," *id.* § 523D.1(2), without running afoul of the prohibition in the IURLTA so long as the fee for those services is not both greater than two months' rent and designed to secure performance of the rental agreement, *id.* §§ 562A.6(12), .12(1); *see also* Paul A. Gordon, Am. Seniors Housing Ass'n, *The Impact of Landlord Tenant Laws on Community Fees* 1 (2007) (contrasting real estate related fees,

which might be subject to landlord–tenant law, with other types of fees linked to provision of services). Further, a nonrefundable entrance fee is generally not a security deposit under the IURLTA. *See De Stefano v. Apts. Downtown, Inc.*, 879 N.W.2d 155, 185–86 (Iowa 2016); *see also M & I First Nat'l Bank v. Episcopal Homes Mgmt., Inc.*, 536 N.W.2d 175, 186 (Wis. Ct. App. 1995) (noting that nonrefundable fee could be a payment to secure execution of the lease and not a security deposit to ensure performance of obligations under a rental agreement).

3. *Application.* In this case, the entrance fee was designed to secure the position of The Reserve (Reserve) in the event of a default, not as consideration for acceptance into the facility or for continuing care services. Specifically, the rental agreement provided,

> Should Applicant default under the terms of the Covenants of Occupancy, which default is not cured in a manner deemed satisfactory by the Corporation, Applicant's Residential Membership shall be terminated and all of Applicant's right, title and interest in and to such Entrance Fee, [and] such Supplemental Amount . . . shall be forfeited by Applicant and become the sole and separate property of the Corporation . . . .

In short, the Reserve used the entrance fee and supplemental amount in the manner of a rental deposit, namely, to secure performance of the rental agreement. *See* Iowa Code § 562A.6(12). And the entrance fee and supplemental amount were each far in excess of two months' rent, the maximum allowable amount for a rental deposit. *See id.* § 562A.12(1). Therefore, the entrance fee and supplemental amount charged by the Reserve were illegal rental deposits prohibited by the IURLTA.

The problem here, as Albaugh points out, is not irreconcilability of statutory provisions. Rather, the problem only arises because the Reserve structured its entrance fee and supplemental amount as rental deposits. The Reserve can charge $120,000 or more as an entrance fee and

supplemental amount; it just cannot charge that amount as a rental deposit.

Consequently, Albaugh was entitled to summary judgment on the IURLTA claim.

**B. Exclusivity.** The provisions in the retirement facilities statute concerning entrance fees do not constitute the exclusive statutory regulation of monies collected and labeled as an entrance fee.

Can a provider regulated under the retirement facilities statute discriminate in charging entrance fees by, for example, charging a woman twice the fee as a man? The Iowa Civil Rights Act, of course, says no. *See* Iowa Code § 216.8(1)(*b*). The majority's approach to this case might allow such discrimination, so long as both entrance fees are greater than $5000, because the regulation of entrance fees in the retirement facilities statute is considered sui generis. But there is no reason to believe the legislature intended to allow such discrimination. Meanwhile, if the requirements of the Iowa Civil Rights Act still apply to entrance fees, why wouldn't the security deposit requirements in the IURLTA also apply?[4]

---

[4]Additionally, even as the majority believes that regulation of entrance fees in the retirement facilities statutes is sui generis, it offers no principle limiting the sui generis in the retirement facilities statute to entrance fees. Perhaps none of the IURLTA applies to facilities regulated under the retirement facilities statute. For instance, the retirement facilities statute states that a "[p]rovider" is "a person undertaking through a lease" to provide care in a facility. Iowa Code § 523D.1(8). So, the retirement facilities statute expects a provider to use a lease. Is that lease also immune from the IURLTA? Likewise, the retirement facilities statute contemplates that facilities will offer lodging. *Id.* § 523D.1(2). Since lodging is authorized under the retirement facilities statute, need the facility comply with requirements in the IURLTA to keep the lodging "in a fit and habitable condition" and "[s]upply running water and reasonable amounts of hot water at all times and reasonable heat"? *Id.* § 562A.15(2), (6).

Indeed, under the majority's reasoning, perhaps any action contemplated in the retirement facilities statute is unregulated by any other provision of the Iowa Code. The retirement facilities statute recognizes that facilities may offer nursing care, *id.* § 523D.1(2), (11), (12), so can facilities offer uncertified nursing care?

Further, there is no exclusivity provision in the retirement facilities statute. By contrast, numerous other parts of the Code contain exclusivity provisions. *See, e.g.,* Iowa Code § 17A.23(1) (Iowa Administrative Procedure Act); *id.* § 85.20 (workers' compensation); *id.* § 216.16(1) (Iowa Civil Rights Act); *id.* § 600A.3(1) (termination of parental rights). "The general assembly can express its intent by omission, and we cannot 'enlarge or otherwise change the terms of a statute as the legislature adopted it.' " *Homan v. Branstad*, 887 N.W.2d 153, 172 (Iowa 2016) (quoting *Marcus v. Young*, 538 N.W.2d 285, 289 (Iowa 1995)). If the legislature intended the provision to be exclusive, it could have said so. *George v. D.W. Zinser Co.*, 762 N.W.2d 865, 872 (Iowa 2009).

At the same time, the legislature has included a broad savings clause in the retirement facilities statute. *See* Iowa Code § 523D.7(5). It says, "This chapter does not limit a liability which may exist by virtue of any other statute or under common law if this chapter were not in effect." *Id.* It is hard to imagine a savings clause whose plain meaning is more antiexclusive. A belief that the entrance fee provisions in the retirement facilities statute are exclusive would rewrite the statute by blue penciling the savings clause. But we do not rewrite statutes. *Doe*, 927 N.W.2d at 665; *Walden*, 870 N.W.2d at 843; *In re A.M.*, 856 N.W.2d at 378.

Finally, there are a number of cases supporting the view that the retirement facilities statute does not exclusively regulate monies collected and labeled an entrance fee. Two decisions from Massachusetts hold statutory provisions regulating security deposits in the state landlord–tenant law apply to "community fees" collected by a senior living facility. *Hennessy v. Brookdale Senior Living Cmtys., Inc.*, No. 1784CV04215BLS2, 2018 WL 4427020, at *1–4 (Mass. Super. Ct. Aug. 1, 2018); *Gowen v. Benchmark Senior Living, LLC,* No. 1684CV03972BLS2, 2017 WL

3251585, at *1–3 (Mass. Super. Ct. May 8, 2017).  Similar to the savings clause in Iowa Code section 523D.7(5), the Massachusetts law regulating senior living facilities provides that the facilities "shall meet the requirements of all applicable federal and state laws and regulations." Mass. Gen. Laws Ann. ch. 19D, § 16 (West, Westlaw current through ch. 12 of 2019 1st Sess.).  The Massachusetts savings clause, according to the *Gowen* court,

> makes clear that [the state statute regulating senior living facilities] is not intended to be an exhaustive regulatory scheme that governs all aspects of assisted living operations. And it also makes clear that [the senior living facility] must comply with all laws that govern residential tenancies to the extent they apply to its facility.
>
> Assisted living facilities can easily comply with both statutory schemes, providing supportive services in accord with [the state statute regulating senior living facilities] to a resident whose tenancy is also governed by [the landlord–tenant law].  Courts must therefore construe and apply these two statutes in a manner that gives "meaning and purpose to both. . . . 'so that the policies underlying both may be honored.'"

2017 WL 3251585, at *2 (quoting *Alliance to Protect Nantucket Sound, Inc. v. Energy Facilities Siting Bd.*, 932 N.E.2d 787, 796 (Mass. 2010)); *accord Hennessy*, 2018 WL 4427020, at *2.  Further, the *Gowen* court explained, the senior living facility may charge a community fee for "services that are beyond the scope of a typical residential tenancy."  *Id.*

Another Massachusetts decision disagrees with the result reached in *Gowen* and *Hennessy.  See Ryan v. Maryann Morse Healthcare Corp.*, No. 1681CV02433A, 2018 WL 6424841, at *5 (Mass. Super. Ct. Jan. 9, 2018).  But the rationale in *Ryan* supports Albaugh's position in this litigation.  "First," the *Ryan* court noted, "[the state statute regulating senior living facilities] does not use the terms 'lease,' 'lessor' or 'tenant' employed in [the landlord–tenant law]."  *Id.*  By contrast, Iowa Code section

523D.1(8) anticipates that providers will utilize leases. Next, the *Ryan* court said that the community fee in the case before it was unlike fees that are "closely related to the leased property." *Ryan*, 2018 WL 6424841, at *5. But in our case, the entrance fee could hardly be more closely related to the leased property, as it was used to secure performance of the lease obligations. "More to the point," the *Ryan* court continued, the Massachusetts statute regulating senior living facilities actually mentions the landlord–tenant law in one provision but not with respect to the fee at issue. *Id.* at *6. Of course, in Iowa, there is no such reference to the IURLTA in the retirement facilities statute (except, of course, in the savings clause which plainly provides for applicability of the IURLTA). Finally, the *Ryan* court said its conclusion

> is bolstered by the fact that [the state statute regulating senior living facilities] provides a comprehensive set of protections to residents in [the facilities]. [The state statute regulating senior living facilities] does not displace landlord–tenant law and leave residents to fend for themselves. It provides a comprehensive list of resident rights which, generally speaking, demand fairness in the [facility]–resident relationship. These rights include privacy rights, use of personal property in the living area and eviction protections— concerns otherwise within the scope of landlord–tenant law.

*Id.* at *7. But the Iowa retirement facilities statute has no such protections. We cannot rely on the *Ryan* court's evaluation of a completely different statutory environment.

Similarly, in *Jackim v. CC–Lake, Inc.*, 842 N.E.2d 1113, 1120 (Ill. App. Ct. 2005), an Illinois appellate court reviewed a different statutory and factual environment. There is no indication that the Illinois statute regulating senior living facilities contains a savings clause like that in Iowa Code section 523D.7(5). Indeed, the *Jackim* court found the absence of such a statement in the Illinois statute important, stating, "If the Illinois legislature intended for entrance fees paid by residents to providers in

connection with life care contracts to be subject to the Security Deposit Interest Act, it could have said so . . . ." *Id.* Well, the Iowa legislature did say so in the savings clause in section 523D.7(5). There is good reason to think that the *Jackim* court would have come to a different conclusion had it before it the Iowa statutory scheme. Further, the *Jackim* court placed great weight on the fact that the plaintiffs' contract with the facility allowed the plaintiffs to move around to different apartments during their lives. *Id.* at 1119. According to the *Jackim* court, that fact precluded finding a landlord–tenant relationship which, in turn, prevented application of the security deposit regulations. *Id.* at 1119–20. But here, the contract between the Reserve and Shirley Voumard only gave her access to one apartment. With key factual and legal bases for *Jackim* being irrelevant to the situation before us, there is little persuasive value to *Jackim.*

**C. The Savings Clause in the Retirement Facilities Statute Precludes that Statute from Preempting the IURLTA.** Further, in the alternative, any irreconcilability between the retirement facilities statute and another statute must be resolved in favor of the other statute. Iowa Code section 523D.7(5) states, "This chapter does not limit a liability which may exist by virtue of any other statute or under common law if this chapter were not in effect."

In considering whether there is liability under another statute—like the IURLTA—the legislature has directed not to limit "any other statute" as if the retirement facilities statute "were not in effect." This is sweeping, unqualified language. To me, the language of the savings clause means that statutory liability arising outside of the retirement facilities statute remains in place and cannot be ousted by language in the retirement facilities statute.

We often struggle with how two statutory regimes scattered throughout the Code fit together. But here, the legislature has given us an answer to the question. If there is statutory liability in another provision of the Code, the retirement facilities statute cannot trump or supersede it.

In fact, Iowa Code section 523D.7(5) trumps our ordinary approach to interpreting conflicting statutes. Ordinarily, as noted, an irreconcilable conflict between a general and specific statute is resolved in favor of the specific statute. *Oyens Feed & Supply, Inc. v. Primebank*, 808 N.W.2d 186, 194 (Iowa 2011). But that approach has no warrant in conflicts between the retirement facilities statute and another statute. In such instances, because of the savings clause, the other statute must prevail over the retirement facilities statute no matter the level of generality.

We cannot amend the unequivocal general savings statute through judicial legislation based on speculation that the legislature would have written the statute differently had it thought more deeply about the application of the IURLTA to the retirement facilities statute. We presume the legislature is aware of existing law. *State v. Adams*, 810 N.W.2d 365, 370 (Iowa 2012). The question is what the statute means, not what the legislature meant. *Richardson v. City of Jefferson*, 257 Iowa 709, 714, 134 N.W.2d 528, 531 (1965).

I break no new ground by following the statute. In *Advest, Inc. v. Kirschner*, No. 92–6656, 1994 WL 18592, at *2 (E.D. Pa. Jan. 21, 1994), the court employed similar reasoning. In *Advest*, the court first determined that securities transactions were covered by Pennsylvania's consumer protection law. *Id.* Then, the court turned to an argument that liability under the consumer protection law was displaced by the Pennsylvania Securities Act. *Id.* The court explained,

> [Plaintiff] . . . argues that since the sale of securities is already regulated by the Pennsylvania Securities Act of 1972, the [consumer protection law] was not intended to apply to securities transactions. It is true that as a rule the particular statute overrides the general, but . . . for [that rule] to apply, the statutes must be irreconcilable. Here, not only may they be reconciled, the securities act expressly states: "[n]othing in this act shall limit any liability which might exist by virtue of any other statute or under common law if this act were not in effect." Thus for me to nullify liability under the [consumer protection law], because of the more specific securities statute, would be for me to construe the above language to the precise converse of plain meaning—the antithesis of apt statutory construction.

*Id.* (fourth alteration in original) (citations omitted) (quoting 70 Pa. Cons. Stat. § 1-506). That is the same situation we have here—the statutes may be reconciled, and even if they could not, the legislature has directed us to avoid the ordinary rule of favoring the more specific statute.

In another case, a federal district court faced the question of "whether the General Assembly 'intended the [Securities Act] and the [consumer protection law] to coexist as independent statutory mechanisms or whether the [Securities Act] is intended to provide the sole and exclusive statutory penalty for alleged' securities violations." *Denison v. Kelly*, 759 F. Supp. 199, 204 (M.D. Pa. 1991) (first and third alterations in original) (quoting *Pekular v. Eich*, 513 A.2d 427, 433 (Pa. Super. Ct. 1986)). The court found that the two statutes could coexist because there was no irreconcilable conflict and because

> the Securities Act nowhere indicates that it is intended as the exclusive statutory remedy for securities violations. In fact, as pointed out by the plaintiffs, it specifically preserves other remedies. [The Securities Act] provides, in pertinent part, that: "Nothing in this act shall limit any liability which might exist by virtue of any other statute or under common law if this act were not in effect." "Any other statute" must encompass the [consumer protection law].

*Id.* (quoting 70 Pa. Cons. Stat. § 1-506).

Until 2005, Iowa's Uniform Securities Act contained a provision practically identical to the savings clause in section 523D.7(5). Specifically, Iowa Code section 502.505 (2003) stated, "Nothing in this chapter shall limit any liability which might exist by virtue of any other statute or under common law if this chapter were not in effect." The only Iowa court to interpret the provision appears to be a district court. *See Cheyenne Camping Ctr. Co. v. Frazer*, No. LA99770, 2004 WL 5238947 (Iowa Dist. Ct. Jan. 1, 2004). The district court noted that courts in other jurisdictions faced with almost identical statutory schemes "have found that the underlying protective purpose of the statute is inconsistent with cutting off additional common law remedies." *Id.* The district court also noted the common practice of joining claims under the securities act with other civil tort claims. *Id.* (citing *Kramersmeier v. R.G. Dickinson & Co.*, 440 N.W.2d 873, 878 (Iowa 1989)). On that authority, the district court found the plaintiff "is not precluded from asserting its common law causes of action while pursuing a remedy through [the securities act]." *Id.*

The notion of broad savings clauses preserving preexisting statutes is commonplace in securities and franchise laws, where many states have savings clauses virtually identical to that in the retirement facilities statute. In *Andersen v. Griswold International, LLC*, No. 14-CV-02560-EDL, 2014 WL 12694138, at *5 (N.D. Cal. Dec. 16, 2014), the court said, "The plain language of the statute preserves preexisting common law and statutes enacted before the [California Franchise Investment Law] that would apply if it had not been enacted." In *Tractor & Farm Supply, Inc. v. Ford New Holland, Inc.*, 898 F. Supp. 1198, 1204 (W.D. Ky. 1995) (quoting Mich. Comp. Laws § 445.1434), the court declared, "[T]he Franchise Law's remedies are cumulative; the Law clearly states '[n]othing in this act shall limit a liability which may exist by virtue of any other statute or common

law if this act were not in effect.'" In *Victory Lane Quick Oil Change, Inc. v. Hoss*, No. 07-14463, 2009 WL 2461183, at *3 (E.D. Mich. Aug. 10, 2009), the court noted, "[T]he [Michigan Franchise Investment Law] does not limit the availability of causes of action created by other statute or common law." In *Ugarte v. Atlas Securities, Inc.*, No. C043720, 2004 WL 670857, at *6 (Cal. Ct. App. Apr. 1, 2004), the court explained, "[T]he Corporations Code does not interfere with existing common law causes of action." In *Toyz, Inc. v. Wireless Toyz, Inc.*, 799 F. Supp. 2d 737, 745 (E.D. Mich. 2011), the court stated, "The plain language of the statute does not limit any other cause of action brought under common law." In *Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc.*, 540 N.Y.S.2d 131, 135 (Sup. Ct. 1988), the court denied a motion to dismiss claims of common law fraud and breach of contract on the basis of a statute of limitations in the General Business Law because the business law "explicitly states that it does not limit any liabilities which exist under common law." In *H.R.R. Zimmerman Co. v. Tecumseh Products Co.*, No. 99 C 5437, 2001 WL 289867, at *4 (N.D. Ill. Mar. 15, 2001), the court declared, "The language [the plaintiff] relies upon is . . . unambiguous in that it does not preclude any causes of action available outside of this Act." In *Brennan v. Reed, Smith, Shaw & McClay*, 450 A.2d 740, 747 (Pa. Super. Ct. 1982), the court explained, "The act . . . does not interfere with any independent rights of action that might exist at common law such as a suit for legal malpractice." In *L.A. Insurance Agency Franchising, LLC v. Elia*, No. 18-13523, 2019 WL 1515412, at *4 (E.D. Mich. Apr. 8, 2019), the court said, "[T]he Michigan Franchise Investment Law specifically protects a party's other common law contract rights . . . ." In *Southern Illinois Beverage, Inc. v. Hansen Beverage Co.*, No. 07-CV-391-DRH, 2007 WL 3046273, at *4 (S.D. Ill. Oct. 15, 2007), the court explained, "It is proper to plead [Illinois Franchise

Disclosure Act] claims with common-law claims because, as the statute expressly provides, it does not preempt remedies under the common law and other statutes." In *Tyszka v. Make & Take Holding, LLC*, 900 N.Y.S.2d 211, 212–13 (App. Div. 2010) (alterations in original), the court noted,

> We agree with the determination of the court in its written decision that "[t]he final sentence of the provision preserves [preexisting] common law claims which would exist under the common law if the Act were not in effect, [but that], here, the only violation alleged as against [defendant] is aiding and abetting a violation of the Act itself, not a free-standing common law violation. For claims arising out of statutory violations of the Act, the Act itself provides the plaintiffs with their exclusive remedy.

Commentators agree with those interpretations. In Illinois, because of the savings clause, "the Franchise Act does not preempt common law and other statutory remedies." James K. Genden, *A Guide to the Illinois Franchise Disclosure Act*, 20 Franchise L.J. 59, 60 (2000). The savings clause in Pennsylvania's securities law "specifically directs that the remedies provided by the [securities law] are not exclusive" and that the law "was not intended to displace or supersede existing common law remedies for fraud." Kurt M. Saunders, Comment, *Proof of Fault in Actions for Securities Fraud: A Cloud in Pennsylvania's Blue Sky*, 46 U. Pitt. L. Rev. 1083, 1091 & n.57 (1985). "In fact, *all* Blue Sky [Securities] Laws are "additive"—i.e., intended to supplement other remedies available to defrauded investors." Jesse Stewart, *False Conflicts: A 50-State Survey of Blue Sky Laws*, 25 PIABA B.J. 383, 383 (2018).

I have found two cases taking a somewhat different approach with respect to common law claims. These cases generally conclude that California statutes were intended to displace the common law concerning particular matters. *See Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*,

637 F. Supp. 2d 712, 721–22 (C.D. Cal. 2008); *Mirkin v. Wasserman*, 858 P.2d 568, 582 (Cal. 1993).

For one thing, it is not even clear that *Samica* and *Mirkin* would support the Reserve in this case. Both of those cases decided that *common law* claims did not survive, *Samica*, 637 F. Supp. 2d at 721–22; *Mirkin*, 858 P.2d at 582, whereas Albaugh's claim is statutorily based. It is perfectly conceivable that the California legislature intended to override the common law to a greater extent than its own statutes. Further, those cases held that the common law claims did not survive because the California legislature had provided an analogous remedy. *Samica*, 637 F. Supp. 2d at 721–22; *Mirkin*, 858 P.2d at 582. But here, the retirement facilities statute provides no remedy where a landlord collects an illegal rental deposit. That is addressed in the IURLTA.

In any case, *Samica* and *Mirkin* were wrongly decided. Aside from being against the great weight of authority on the matter, as recounted above, the reasoning in those opinions has been specifically rejected in other judicial opinions. *Toyz*, 799 F. Supp. 2d at 745 (rejecting reasoning in *Samica*); *Mirkin*, 858 P.2d at 594–95 (Kennard, J., concurring and dissenting) (rejecting *Mirkin* majority); *see also* Christopher Boffey, Note, Mirkin v. Wasserman*: The Supreme Court of California Rejects the Fraud-on-the-Market Theory in State Law Deceit Actions*, 49 Bus. Law. 715, 736 (1994) [hereinafter Boffey] (same). The *Samica* and *Mirkin* courts forgot that the purpose of the purportedly preemptive statute was to protect consumers through disclosure and other requirements—just like the retirement facilities statute—by adding remedies rather than replacing them. *Mirkin*, 858 P.2d at 594–95; Boffey, 49 Bus. Law. at 736–37. Indeed, the *Samica* and *Mirkin* courts ignored the plain meaning of the savings clauses which sought to ensure that such purpose would be

achieved.  *Toyz*, 799 F. Supp. 2d at 745; *Mirkin*, 858 P.2d at 594–95; *see* Boffey, 49 Bus. Law. at 736 ("[I]t seems likely the [*Mirkin*] court overlooked that federal and state securities laws were not intended to provide exclusive remedies for securities transactions involving deceit.  Both the California Corporations Code, and the Securities Exchange Act of 1934 include sections that make it clear the remedies created by them were intended to supplement (and not replace) remedies available under common and other statutory laws." (Footnotes omitted.)).  Justice Kennard put it well:

> To speak, as the majority does, of a "conflict" between securities law remedies and the traditional action for fraud is to ignore the decisions of our state Legislature and Congress to make securities laws nonexclusive and cumulative to traditional tort remedies.

*Mirkin*, 858 P.2d at 595.  Justice Kennard's reasoning applies with full force to the question before us concerning the relationship between the retirement facilities statute and the IURLTA.

In my view, Voumard's daughter, acting as her substitute, was entitled to partial summary judgment on the IURLTA claim.  The Reserve was not entitled to summary judgment on the IURLTA claim.  I would so hold, reverse, and remand the case to the district court.

### III.  Conclusion.

For the reasons discussed above, I would reverse the district court judgment on the IURLTA claim, grant summary judgment to Albaugh on the IURLTA claim, and remand to the district court for further proceedings.

Wiggins, J., joins this dissent.